## ANGLE et al. v. RICHARDSON.

## S. S. WHITE DENTAL MFG. CO. et al. v. RICHARDSON et al.

## No. 8745.

Circuit Court of Appeals, Ninth Circuit.

June 16, 1938.

against cross-defendants on claim 2 of such patent and none other and ordered an accounting. The cross-defendants appeal from the judgment entered therein.

Lyon & Lyon, of Los Angeles, Cal. (Henry N. Paul, Jr., of Philadelphia, Pa., and Frederick S. Lyon, of Los Angeles, Cal., of counsel), for appellants.

Thomas A. Reynolds and Wilbur D. Finch, both of Los Angeles, Cal. (J. Calvin Brown, of Los Angeles, Cal., of counsel), for appellees.

Before GARRECHT, HANEY, and STEPHENS, Circuit Judges.

STEPHENS, Circuit Judge.

The plaintiffs, Anna Hopkins Angle and the S. S. White Dental Manufacturing Company, a corporation, filed their bill of complaint in the District Court as owner and licensee respectively of Letters Patent No. 1,584,501,[1] granted to Edward H. Angle May 16, 1926, charging infringement by the defendant Sidney Richardson.

The trial court found for the plaintiffs and ordered an accounting and no appeal has been taken. Prior to the trial in the matter just mentioned, the defendant, having first secured leave, filed a bill of cross-complaint against the mentioned plaintiffs claiming that they had infringed patent No. 1,976,141, granted Oct. 9, 1934 to himself and Charles Edward Boyd. The grant to Boyd was as the assignee of a one-half interest in the patent. The trial court found in favor of cross-complainants and

Both patents above mentioned relate to a metal tie-bracket but a small fraction of an inch in width, length and thickness. In use it is affixed to a band of metal which is placed around a tooth. A wire or arch-bar anchored at each end engages the central slot in the bracket. There is also an upper and a lower notch in the bracket. The arch-bar runs around the dental arch and is secured in the central slot by wire ligatures. It is an appliance used in the moving of malposed teeth to proper positions.

Tie Bracket (greatly enlarged).
Base A, B, C, (D not shown) attaches to band around tooth.
Arch-bar (shaded area) fits into slot.
Fine wire, not shown in cut, loops around end notches of bracket.

The trial court found the Dr. Angle patent valid and infringed by the Richardson patent. However in the cross-action,

[1] After a detailed description of the bracket, Dr. Angle's patent application contains the following:

"I do not desire to limit my invention to the precise details of construction and arrangement as herein set forth, as it is obvious that various modifications may be made therein without departing from the essential features of my invention as defined in the appended claims.

"Having thus described my invention, I claim:

"1. An orthodontic appliance comprising a tooth-band bracket having an arch-bar receiving slot in its outer face, and having its oppositely directed lateral faces recessed to form projections extending away from said slot.

"2. An orthodontic appliance comprising a tooth-band bracket having an arch-bar receiving slot in its outer face, and having undercut recesses extending longitudinally through the lateral faces of said bracket.

"3. An orthodontic appliance comprising a tooth-band bracket having an arch-bar receiving slot in its outer face, and having lateral projections affording recesses serving as guides upon opposite sides of said slot and opening outwardly therefrom.

"4. An orthodontic appliance comprising a tooth-band bracket having parallel slots respectively disposed in its outer face and in its lateral faces.

"5. An orthodontic appliance comprising a tooth-band bracket having parallel slots respectively disposed in three of its adjacent intersecting faces.

"6. An orthodontic appliance comprising a tooth-band bracket having an arch-bar slot in its outer face and having oppositely directed flanges extended laterally away from the sides of said slot in a plane with the rear face of said bracket, and having similar flanges extended laterally substantially in the plane of said outer face of said bracket."

the Richardson patent was held valid as to claim 2 thereof and infringed by cross-defendants. Claim 2, as cross-complainant in his brief has separated it into lettered clauses, is as follows:

"2. The herein described method of producing a one piece orthodontic band bracket, which consists

"(a) in first cutting a transverse slot in the top face of a block of hard tough metal

"(b) and then simultaneously cutting transverse slots in the end portions of said block and substantially parallel to said first slot, .

"(c) said cutting of said block in each instance being so effected as to retain the fibers and molecules in the uncut portions of said block in their original positions without distorting and stretching the same."

Dr. Angle was an orthodontist, a teacher of orthodontia and an inventor of appliances for "straightening" teeth. In the experimental stages he used a circular saw in a jeweler's lathe to cut his brackets from wire. The evidence shows that he sometimes cut the end notches first and sometimes the top or central slot first.

A letter dated Aug. 26, 1925 signed by Dr. Angle and addressed to White Co. contained the following: "This [model] bracket was sawed from a metal bar rolled, drawn and milled."

Dr. Edw. J. Gromme, graduate of the Dr. Angle school, testified that he observed Dr. Angle making experimental tie-brackets in the year 1925. He testified as follows as to the method employed:

"wire of specific dimensions was passed through this plate and under the hold-down, and carried against the saw, so that the slot could be cut in proper position. In cutting the grooves, these brackets were made in one long strip, the grooves for the arch receiving slot and the grooves for the ears of the bracket were cut longitudinally to the strip of wire. The wire was usually about eight inches long. There was not any specific routine for cutting the piece, I don't believe. I did not observe whether he cut the ears first, or whether he cut the arch receiving slot first. Sometimes they were cut one way—from the samples we have we could see they were cut sometimes one way, and sometimes the other. The samples that were found were clippings or cuttings from the lathe, which Dr. Angle kept as a matter of historic interest."

Drs. Allen G. Brodie and Chas. E. Boyd, both Angle school graduates, testified that they used the Angle tie-brackets in 1926.

After the patent was granted to Dr. Angle (patent No. 1,584,501, May 11, 1926) the S. S. White Dental Manufacturing Company acquired and exercised the licensee right to manufacture the brackets and market them to the trade and has ever since retained and exercised such right. White Company began making the bracket by saw-cutting but soon changed the method so as to produce the bracket by a stamping process from "clasp" metal. This process broke down the fibers or disarranged the molecular formation of the metal to some extent so that the bracket was less strong than the milled or lathed bracket. Under pressure it would sometimes spread and thereby interfere with the desired "pull" upon the tooth under treatment.

Sidney Richardson is a metallurgist and after meeting Dr. Angle at the latter's school began to experiment upon a possible improvement upon the Angle bracket. He, with some advice from Drs. Steiner and Boyd, worked out a model of bracket designed to withstand a greater pressure than the White stamped bracket. He compounded an alloy having a greater degree of hardness and toughness than that used by White Company. The Richardson product did not differ from the Angle bracket in principle and differed but slightly in design. The principal difference in design being that a thicker base of metal was left under the slot. The harder and tougher alloy, the thicker base and the cutting resulted in a stronger article. It appears from the evidence that some orthodontists prefer the White production with the softer metal, while others prefer the stronger bracket.

Richardson's product was completed in 1931 and manufactured and sold in 1932. Richardson and his associates were working upon improvements to the Angle bracket with Mrs. Angle's knowledge and secured her consent to the idea of approaching the White Company with a proposal that it market Richardson's bracket. Dr. Steiner went to Philadelphia and demonstrated it to the White Company. Dr. Angle had died in 1930 and Mrs. Angle succeeded to ownership of the patent.

Before Dr. Steiner went East a contract was entered into between Richardson, Steiner and Boyd, whereby Steiner and Boyd would get a royalty for every bracket that should be sold by the White Company. It would appear from the evidence that

any arrangement was to contemplate the proprietary rights of Mrs. Angle in the Angle patent. There is no evidence of any thought of Richardson's getting a patent until later. Nothing ever came of the attempt to get the White Company to market the Richardson product.

Sometime after the return of Dr. Steiner, the White Company added a stronger bracket to its line by making and using a more resisting alloy of metals from which they were made, and by using a thicker base. They saw-cut or milled the metal as Dr. Angle and the White Company had originally done and as Richardson did in his product.

Richardson testifies that he gave Dr. Steiner a written formula of his alloy and claims that this was delivered to the White Company along with his bracket models and that the new strong bracket manufactured by White was a very close copy of Richardson's product in composition, form and method of manufacture.

Steiner says he never had a copy of the formula and never gave any formula to the White Company.

White Company continued to manufacture both types of brackets up to the issuance of the patent to Richardson, Oct. 9, 1934, when it suspended making brackets of any kind until Oct. 31, 1934, when it resumed manufacture without change except as to the sequence of cutting the slots and notches in the bracket composed of the stronger alloy. They avoided cutting the slots and notches in the sequence detailed in Claim 2 of Richardson's patent. Except for the short cessation in bracket making just mentioned, the White Company has continued to manufacture and market the bracket stamped from the softer metal.

Much evidence was introduced relative to the testing of metals for hardness and toughness and as to the breakdown of clasp metals under a stamping process, but in the view we take of the case such evidence need not be detailed in this opinion.

After the trial the Court prepared and filed an extensive opinion which also served as its Findings of Fact and Conclusions of Law. Therein the Court commented upon the White Company's action in suspending the manufacture of brackets and upon its avoiding the Richardson sequence of cutting slots or notches when it resumed the making of brackets. The Court said:

"This attitude is tantamount to an acknowledgement of the validity of Claim 2 of the Richardson patent in suit, as well as the infringement thereof by the White Company prior to October 31, 1934."

Appellants consider this statement as a Finding of Fact and that the Court regarded such attitude of the White Company as estopping it from denying legality of the patent and from denying infringement thereof. We take it that the Court was merely stating that such attitude was a strong circumstance that should be taken into consideration in deciding the issues there presented. Our view is supported by another passage of the opinion. The Court was referring to a letter written by Richardson in which he refused to fill an order for brackets received from a practicing orthodontist. He wrote:

"Owing to the brackets being patented (Dr. Angle's patent), we are unable to make them for you."

The Court remarked in its opinion:

"This attitude does not conform to his present contention. Of course we do not hold that such concession precludes the defendant from now contending that the patent is invalidated by prior public use or otherwise, but we do say that it is a significant admission against interest that should weigh in considering the equities of this suit."

It is hardly necessary to point out the inconsistencies of these two expressions if we accept appellants' understanding of them. Our view however harmonizes them.

## Is the Richardson Patent Valid?

We come to the validity of the Richardson patent and in such consideration it would seem necessary to inquire directly as to just what is claimed as the invention in Claim 2 of the Richardson patent which the trial court held valid. A claim for a patent must relate to something useful, it must have novelty and it must conform to § 33 of 35 U.S.C.A., which we quote.

"Before any inventor or discoverer shall receive a patent for his invention or discovery he shall make application therefor, in writing, to the Commissioner of Patents, and shall file in the Patent Office a written description of the same, and of the manner and process of making, constructing, compounding, and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art or science to which it appertains, or with which it is most nearly connected, to make, construct, compound, and use the same."

See The Incandescent Lamp Patent, 159 U.S. 465-472, 16 S.Ct. 75, 40 L.Ed. 221. And as said in the very recent case of General Electric Co. v. Wabash Appliance Corp., 58 S.Ct. 899, 901, 82 L.Ed. ——, decided by the Supreme Court May 16, 1938,

"We may assume that Pacz has sufficiently informed those skilled in the art how to make and use his filament. The statute has another command. Recognizing that most inventions represent improvements on some existing article, process, or machine, and that a description of the invention must in large part set out what is old, in order to facilitate the understanding of what is new, Congress requires of the applicant 'a distinct and specific statement of what he claims to be new, and to be his invention.' [Merrill v. Yeomans, 94 U.S. 568, 570, 24 L.Ed. 235.] Patents, whether basic or for improvements, must comply accurately and precisely with the statutory requirement as to claims of invention or discovery."

The Richardson product is claimed as an improvement over the Dr. Angle bracket—it is not claimed to be a new appliance—but the claim does not attempt to meet any part of these requirements.

■ Neither through the evidence nor the briefs is the claimed invention made clear. It would not appear to be contended by appellee that the Richardson product is any more than a refined and stronger Dr. Angle bracket. It performs exactly the same function upon exactly the same principle. We shall look at the elements of the patent as expressed in the claim. The invention does not purport, in the wording of Claim 2, to be confined to any particular kind of metal or any particular formula for an alloy of metals. The element first required is "a block of hard tough metal." There is evidence from which it could be judicially found that the metal used by Richardson was both hard and tough comparatively speaking. There is no evidence, however, to the effect that "hard tough" metal is a scientific or trade expression with a definite meaning or falling within a defined range as shown in Goodyear Dental Vulcanite Co. v. Davis, 102 U.S. 222, 26 L.Ed. 149, in referring to "hard rubber" or "vulcanite." Surely there can be no patent upon anything that will answer this indefinite and comparative description. It was said in Holland Furniture Co. v. Perkins Glue Co., 277 U.S. 245, at page 254, 48 S. Ct. 474, at page 478, 72 L.Ed. 868,

"It was necessary that the Perkins' patent, so far as it is a patent of a composition of matter, should contain some description of the ingredients entering into the composition which would both define the invention [citing authorities] and carry it beyond the previous development of the art."

And again on page 255, 48 S.Ct. on page 478,

"There can be no description of a composition of matter without some designation of its ingredients."

The trial court referred to this subject as follows (19 F.Supp. page 1008):

"But when the generic inventive aspect of the Angle patent is considered with the drawings, specification matter, and broad claims that are found in it, the general and nebulous descriptions, disclosures, or claims of Richardson are insufficient to justify any patent protection to the 'hard tough metal' that is used by him in his practice of making orthodontic band brackets."

Appellees rely upon Anraku v. General Electric Co., 9 Cir., 80 F.2d 958, but that case is not out of harmony with the cases we have cited nor with the quoted comments of the trial court. It deals with the very technical and scientific subject of filament in incandescent light globes and according to the opinion describes the process and defines the ingredients with such detail as would be required for one skilled in the art to construct it. See, Diamond Rubber Co. v. Consolidated Tire Co., 220 U.S. 428, 435, 31 S.Ct. 444, 55 L.Ed. 527. But cf., General Electric Co. v. Wabash Appliance Corp., supra.

In what we have said we are not to be understood as adjudicating a product patent, for we recognize in the Richardson patent and its Claim 2—the only claim before us—only a claimed process patent.

■ We continue with our analysis of the Richardson claim: "a transverse slot [is cut] in the top face of such block." Can there be a patent upon the mere cutting of a slot in a block of hard tough metal? To ask the question is to answer it. Dr. Angle had been doing that very thing long before the Richardson patent and furnishing his students with the finished article.

Then "simultaneously cutting transverse slots in the end portions of said block and substantially parallel to said first slot." Richardson's counsel admit in their briefs that there is no patentable novelty and no added virtue in the sequence of cutting. The

real claimed improvement over Dr. Angle's first efforts is that by cutting instead of stamping the bracket from a relatively "hard tough metal" the structure of the metal will not be broken down and it will withstand more pressure.[2] But the court referring to the Richardson patent proceeded to find,

"It is clear from the evidence that the patent was and is limited to a sequence of steps in a specified process of production. It is a restricted method patent. There is no grant of a product or appliance nor as to the degree of hardness or toughness of the metal from which a product or appliance is fabricated."

The Court then holds, as the appellees admit, that the mere "order of cutting the slots" has no significance and holds that changing the order of cutting is an equivalent to any other order of cutting them. Thus we have the patent held valid upon the point that the slots are cut and upon no other sanction. Upon such sanction the White Company and its licensor was held to have infringed the Richardson patent. We are unable to follow the trial court in this conclusion. We cannot find a thing in Claim 2 to which a legal patent can be tied.

But assuming the Richardson Claim 2 to describe a "restrictive method" patent we agree with appellants as expressed in their brief that "there is no room for any application of the doctrine of equivalents as applied to the claim in this suit. The claim is specific. Any attempt to broaden it in regard to the sequence of operations makes it a claim for a bracket having cut slots *and such a bracket was old in the art.* [italics ours] Once the specified sequence is disregarded, the claim is fully anticipated. * * *"

We find that clauses (a) and (b) of the claim which consist "in first cutting a transverse slot in the top face of a block of hard tough metal and then simultaneously cutting transverse slots in the end portions of said block and substantially parallel to said first slot" standing separately or together offer nothing patentable for the reason that cutting metal (if patentable at all) is very old and had been anticipated by Dr. Angle and the White Company in making orthodontic brackets, because the sequence of cutting slots makes no difference in their function or in the result obtained, and because the expression "hard and tough" metal is too indefinite to have any significance.

---

[2] The following history of the application for patent by Richardson throws light upon the question under consideration.

Patent applied for June 1, 1932. Rejection was made by Examiner Sept. 30, 1932 as follows:

"Claims 1 to 6 are rejected as completely met by the Angle (2) patent.

"Claims 7 to 9 are rejected for lack of invention over the Angle (2) patent. It is apparent that the Angle attachment was made from a single solid block of tough material."

Richardson amended his petition thereafter,

"Applicant herewith amends his claims so that the same are all directed to the method of making an orthodontic band bracket and which method consists in the production of a substantially rectangular block of relatively hard tough metal and then cutting said block * * * applicant cuts or mills the solid block without distorting or disturbing the fibers and molecules of metal in the block and thereby produces a greatly improved and much stronger bracket. * * *"

The Examiner rejected such claims, saying in part,

"It is not invention to use a milling method to shape any article from a block of metal. Such method is purely a matter of mechanical skill."

Applicant again amended his claims, claiming that the cutting is done "without disturbing or distorting the position of the fibers and molecules of metal." To which the patent examiner replied in part,

"Method claims are allowed only when applicant has taught the art something new in the way of manufacture. This is not present in this case as Richardson [evidently meaning Dr. Angle instead of Richardson] teaches what applicant now claims. Applicant may have devised a new and better article but he has merely adopted the old method of making it. This does not constitute a method invention."

To another amendment, the Examiner replied in part,

"It would not require invention to utilize a cutting or milling method to manufacture the desired shape but would appear to be well within the common knowledge and skill of a mechanic, wherever desired or required rather than such a technical improvement involving originality or conception rising to the dignity of invention.

"The various structural limitations add nothing of a patentable nature to the case. No new and unexpected result is produced by the old and known expedient of cutting."

742

We find that clause (c) of the claim which continues in the same sentence with the other clauses, "said cutting of said block in each instance being so effected as to retain the fibers and molecules in the uncut portions of said block in their original positions without distorting and stretching the same," offers nothing patentable for the reason that there is no particular or definite manner prescribed which when followed, and because it is followed, produces a cut that "retains the fibers and molecules in their original positions without distorting and stretching the same."

■ Because of the foregoing, we find the Richardson Claim 2 offers nothing patentable and that the claim relates to a process for making an orthodontic bracket which is anticipated by the Dr. Angle patent.

Since the case was submitted, counsel for appellee has referred us to the case of Chesapeake & Ohio Ry. Co. v. Kaltenbach, 4 Cir., 1938, 95 F.2d 801. We have reviewed that case with care and with it the cases of Booth v. Stutz Motor Car Co., 7 Cir., 56 F.2d 962, and Hoeltke v. C. M. Kemp Mfg. Co., 4 Cir., 80 F.2d 912, and also the case of Shellmar Products Co. v. Allen-Qualley Co., 7 Cir., 36 F.2d 623. They have no application here for the reason that the pleadings and the proof in the trial court and the briefs here treat the case in suit as one under the patent statutes and not as a general damage action. Cf., American Ornamental Bottle Corp. v. Orange-Crush Co., 4 Cir., 76 F.2d 969.

The judgment is reversed with instructions to dismiss the cross-bill, with costs to the cross-defendants. The appellants are awarded their costs on appeal.