### BOOTH v. STUTZ MOTOR CAR CO. OF AMERICA, Inc., et al.
### No. 4476.

Circuit Court of Appeals, Seventh Circuit.
March 16, 1932.

Frank C. Sibley, of Detroit, Mich., for appellant.

Roemler, Carter & Rust and Hood & Hahn, all of Indianapolis, Ind., for appellees.

Before ALSCHULER, EVANS, and SPARKS, Circuit Judges.

ALSCHULER, Circuit Judge.

Appellant, Booth, appeals from a decree of the District Court dismissing for want of equity his two bills, one (Eq. No. 1004) seeking an accounting for damages and profits from the alleged wrongful appropriation by appellees of appellant's designs for construction of an automobile, the details whereof had been by him disclosed in confidence to appellees, which confidence, the bill charged, appellees betrayed by wrongfully producing a new car embodying Booth's designs and details; and the other (Eq. No. 1048) a bill against Stutz Motor Car Company for injunction and accounting by reason of its alleged infringement of Booth's reissue patent, No. 16,579.

The first bill was upon motion dismissed for want of equity appearing upon its face. Upon appeal this court held that the allegations sufficiently stated a cause of action, and that decree was reversed, and the cause remanded to the District Court. In our opinion it was stated that under Equity Rule 26 (28 USCA § 723) plaintiff had the right to join the two causes of action, and that it was desirable that this be done. 24 F.(2d) 415. Accordingly the two cases were consolidated for hearing and were heard together.

We will consider first the action upon the reissue patent. This has to do with an automobile chassis and driving mechanism so constructed as to enable the floor of the automobile body to be placed considerably closer to the road surface than was theretofore usual in practice. This was accomplished mainly by lowering the transmission shaft to contact with the driving mechansim below the rear axle, and by a decided up-kick of the side members of the chassis frame over the rear axle with also more or less of an up-kick over the front axle.

Booth's original patent, No. 1546708, was granted July 21, 1925, on application filed

June 29, 1922. The reissue patent was granted March 29, 1927, on application filed June 28, 1926. Claims 5 to 10, inclusive, were added on the reissue, and embody the elements whereon the alleged infringement is based. In typical claim 10 [1] the important element is the propeller shaft with worm drive contacting with a worm gear on the under side of the rear axle. The other claims do not describe this as a worm, but mention the contacting driving mechanism of the propeller rod to be applied to the lower side of the axle. The evidence suggests no form of mechanism other than the under-slung worm drive and gear, with up-kicked side members of frame whereby Booth might have dropped his floor a few inches lower than was customary.

The record is replete with evidence of prior publications and uses of the under-slung worm drive in automobiles, both with and without the up-kick of the frame over the rear axle, and in some instances over the front axle as well.

As far back as 1907, which is quite early in the automobile art, in the June 26 number of "The Horseless Age," in a column article headed "The Drop Frame," it is stated: "The greatest freedom in the matter of frame drop is allowed by a worm drive to the rear axle, with the worm located at the bottom of the worm wheel (where it may constantly run in oil), and this drive has been actually used to some extent for cars of the landaulet and brougham types, but it is hardly to be expected that designers will discard the more efficient bevel gear drive in favor of the worm gear simply to be able to use a drop frame. Nevertheless the drop frame and the resulting low carriage floor are most attractive features in motor cabs and closed touring vehicles."

"Omnia-Locomotion," a French publication, illustrates on May 20, 1911, an under-slung worm gear transmission with front and rear up-kick of the frame. Another French publication of 1911 shows the French Daimler car with under-slung transmission and front and rear up-kick of side members of chassis frame. "Internal Combustion Engineering" of November 27, 1912, under the title "Some Typical Rear Axles," shows several having the under-slung type worm axle drive with a decided up-kick in the side members of frame over the axle. Its April 16, 1913, issue illustrates "The Sheffield Simplex 30 H. P. Chassis," with under-slung drive and frame up-kicked. The December 12, 1912, number of "The Automobile" pictures a chassis with rear and front up-kick in frame, and a driving mechanism of which the text says, "worm drive is used in the rear axle with the worm beneath the axle, yet affording a 9.25-inch clearance." A yet more detailed description of these parts there follows. The May 2, 1914, number of "La Vie Automobile," another French publication, shows the under-slung worm drive with frame up-kick over rear axle. "The Automobile Engineer" of September, 1920, illustrates the 20 horse power Wolseley chassis with under-slung worm drive and up-kick in frame. The May 11, 1922, number of "Automotive Industries" describes the "new Fageol stage," saying: "By building a frame with front and rear kickups it has been possible to maintain a low center of gravity, with a single step for entrance." This is doubtless the car for features of which patent No. 1452369 was granted to Fageol on April 17, 1923, on application filed February 16, 1922. The Pugeot car, shown in a French publication, made admittedly more than two years before Booth's invention, shows substantially all the material elements of Booth's claims, combined in very much the same way.

Of course the chasses so shown are equipped with such crossbars as the judgment of the engineer in each case would suggest, and the engines are at such location within the frames and with such inclination relative to the propellor shaft as would suit the exigencies of each case, to be determined by the mechanical judgment of the engineer.

We are satisfied that the claims here in issue involve no patentable advance over prior art and disclosures, and are invalid, and that there was no error in dismissing this bill.

This brings us to what seems to be Booth's main grievance, viz., the alleged breach of confidence as charged in the suit brought thereon.

[1] "10. In an automobile, the combination of a pair of front wheels and a front axle, a pair of rear driving wheels, a rear axle housing provided with a worm gear and driving shafts, a chassis frame provided with one or more cross bars and kicked up over the rear axle to give the usual necessary clearance due to the axle movements and spring flexure, the said chassis frame having a relatively deep drop immediately in front of the axle and the said drop portion of the chassis frame located at the level of the rear axle with the lower portions of the chassis frame below the center of the rear axle, an engine supported on the front of the chassis frame immediately at the rear of the front axle and largely above the chassis frame, a propellor shaft under said cross-bar, or bars, and connecting the engine with the rear axle housing and under-slung on the latter, thereby making possible the lowering of the chassis frame, said propeller shaft being provided at its rear end with a worm having a driving relation with the said worm gear on the under side thereof."

Stutz Motor Car Company was a long-time manufacturer of automobiles at Indianapolis. Of the individual appellees, Schwab, Thayer, and Schmidlapp, of New York, were directors and principal stockholders of Stutz. Thompson had long been its president until succeeded by Moskovics February 17, 1925, but remained with Stutz two months longer upon full pay. Crawford was its chief engineer both before and after Moskovics became president. Bastien and Twyman, who had worked with Booth or upon his experimental car, afterwards had some employment in the production of the new Stutz car.

Under date of September 29, 1924, Booth wrote Schwab a long letter, quotations from which, set forth in the margin,[2] may help to an understanding of Booth and his claimed achievement.

We quote thus fully from Booth's initial letter to indicate that Booth regarded himself as primarily an artist, with a fine sense of lines and proportions coupled with an engineering skill which well fitted him to apply "true artistry to cold mechanism," and, withal, as showing his quite adequate appreciation of his own talents, which evidently were of no mean degree.

October 9 Schwab replied saying he was not an automobile man and, referring to his interest in the Stutz company, suggested that its plant might be adapted to produce a new car, and saying he would like President Thompson to examine Booth's proposition.

[2] "Re: A distinctly new automobile design.

"Dear Mr. Schwab:

"I have a feeling you might take pleasure in looking over the designs and drawings for an entirely new automobile. I assure you the design is absolutely out of the ordinary. * * *

"The design is the result of many years careful study and critical analysis from the dispassionate viewpoint of an idealist standing on the sidelines responsible only to himself. I am an artist, coming from a family of art patrons—an automotive engineer (member of S. A. E.) and a capitalist in a modest way, with over 20 years of first hand experience in owning and driving every style of car from Fords to Pierce Arrows. My greatest interest lies in the application of true artistry to cold mechanism and in perfecting details generally neglected—i. e., applying psychological sales appeal, dignity and distinction to an automobile in ways other designers never seem to think of. * * *

"After we sold the Scripps-Booth Company to the General Motors Corp. about 1917 I moved my family to California to pursue my painting under suitable conditions, and on the side to crystallize as rapidly as possible my many ideas and convictions on automobile design. Two years ago I returned to Detroit with my drawings and layouts, sought out and engaged the services of one of the world's most capable automotive engineers to develop and perfect my ideas toward a practical manufacturing and sales proposition. Since then a corps of draftsmen under his direct personal supervision have been kept busy (without hurry) turning out detailed working drawings of every part of the car, using up a third of a mile of drawing paper. Only recently have these drawings approached completion.

"I have insisted from the beginning that the designs should be perfected so far as humanly possible On Paper before I sought means to place test cars on the road. It is so much cheaper and more satisfactory to be Right on paper than to wish you had been later. * * * I felt sure that with a superlative motor, first class engineering and with my own knowledge of art as applied to bodies, balance and comfort features in happy combination would make a mightily attractive product for someone to manufacture. I am really not in the manufacturing business myself and hence my desire to interest one of your standing and capacity who has manufacturing connections at his elbow and who could so quickly have test cars put through their paces and lay the foundations so rapidly for a successful business.

"I hasten to advise you, Mr. Schwab, that my designs have Not been offered promiscuously to the trade. I am particular and if the stage can't be set by gentlemen I'd rather not do business and would much prefer rolling up my drawings and locking them in a safe before I would permit any loud-talking promoter to ruin the wonderful future due this job. * * * Allow me to show you the drawings at your convenience or permit me at least to demonstrate the idea to one of your lieutenants who is versed in automotive matters and who could report back to you. No harm done at all if you find no interest in it. * * *

"Mr. Schwab, where any other car has the ghost of a good reason for being in existence, my job has Half a Dozen * * * My job is an harmonious whole, seen first as a complete car and then detailed on paper. Too many designers in placing their radiators don't seem to know where the bottom curve of the rear door is going to come. A Real car must first be seen as an inspired vision and in its entirety. Just as the foundation determines the house above it, so the chassis of a car has Everything to do with the success of the body design and the comfort of the passengers. There are too many chassis engineers interested only in pure mechanism and who apparently take little pride or interest in just how the body designer is going to get the passengers on board. I placed my passengers on board first and fitted the mechanism Around them. Every consideration was given to the comfort and convenience of passengers initially with the result that No mechanism protrudes in an unsightly way through the floor (like a poor job of exposed soil pipe installation through the ceiling of one's library), nor does an elderly lady have to climb up stairs to enter the car because I show the Lowest floor found in any car in the world. This is fact, but road clearance is normal, think of it. Neither does the same elderly lady have to slide down onto a seat cushion only six inches high, but instead sits in comfort and dignity at Chair height above the low floor. * * *

"It is unusual of course for any concern to seek for or purchase a design of a new model outside their own engineering offices. The pride and faith of a directorate in their own organization to produce the best there is, is natural—But if from some outside source there does come the opportunity to acquire a World Beater at a fair price, any engineering force that had the good of their concern at heart would most heartily welcome such a job as suggested here.

"Be assured my car is quite distinctly different—not different just for the sake of being different, but for Good sound reasons—because it is Better. Because I am a free lance in the art and engineering world and don't have to worry about bread, I can dare to think in advance of the crowd. I have no old tools or fixtures to consider, and no stock bin crowded with material to be used up before improvements can be made. Nothing to live down or tie my hands—I started with a clean slate and

October 14 Booth wrote Schwab saying that Thompson was welcome at any time to look over the designs, and that "he may feel free to ask me questions or to give me information in confidence and I know any information I may impart to him concerning my principles of design will be treated the same way."

Booth therefore brought his blueprints to Indianapolis, and on October 24 wrote Thompson thanking him for courtesy shown when at the plant the week before—referring to Thompson's favorable comments on the blueprints submitted—and extolling his designs very much as in his first letter to Schwab.

October 27 Thompson wrote Booth, saying that since Booth's visit to the factory "a complete report of your layout shown to Mr. Crawford has been prepared and submitted to Mr. Schwab with our comments thereon. Needless to say, we are very much interested in your proposition as I think it coincides with our ideas expressed as to the future car for Stutz to produce, as we have often stated in considering this proposition that we would like to produce something exclusive and something different from that produced by every other manufacturer of motor cars."

He suggested that if arrangements could be made it would be desirable, for the immediate future at least, to employ in the car the Stutz motor, and that experimenal work could then be carried on with the Argyle motor, which Booth had intended for his car.

October 29 Thompson wrote Booth:

"Since writing you under date of October 27th I am in receipt of a letter from Mr. Schwab in which I am instructed to secure full information concerning your desires in reference to our taking an active interest in your recently submitted designs by the development of cars of this description in anticipation of our accepting them for production.

"It is Mr. Schwab's desire to have your complete proposition laid before him and our recommendations in reference to same, and will therefore ask you to fully advise me at the earliest possible date just what proposition you have in mind.

"As we have before intimated, we are very much interested in your proposition for the disposition of same, assuming that it is your desire to dispose of it complete.

"You state in your first letter to Mr. Schwab that you own the patents, the patent licenses and all the designs for the car and that you are free to deal in any way you see fit in respect to disposing of same and in this connection will have you know that we would be interested in securing your complete designs, and if it is possible that your patents are such that it would be impossible for another manufacturer to produce a car of a similar design, this would be most desirable.

"Thanking you therefore for giving me complete information and assuring you that any proposition you make to us, or any information you give us will be strictly confidential, I am"

October 30 Crawford wrote Booth in reference to necessary changes in the plans for the purpose of substituting the Stutz motor for the Argyle, wiring him that prints of the former were being forwarded.

The correspondence continued, as well as personal interviews. November 25 Thompson wrote Booth, saying that after thoroughly discussing the proposition it was definitely concluded that they could not be further interested. There was then some correspondence between Booth and Thayer, and Booth met Thayer and Schwab at New York, and the latter told him that they were not in position to further a new program.

From Crawford's letter to Booth of February 3, 1925,[3] it seems that interest in the

---

the job is clean-cut as a result. I know that I Know whereof I speak.

"Inasmuch as I own the patents, the patent license and all the designs for the car I suggest for your consideration I am free to deal in any way I see fit. Naturally I am most anxious to have this job see the light of day as soon as possible—it will still be ahead of the procession if it weren't built for some time and for this reason I dare to hold off for the right combination to handle it. It would be a job in which you could have every just pride —a creditable thing for any gentleman to produce. Drawings are in such shape that sample cars could be placed on the road in short order—a matter of three or four months. I will gladly include my services gratis toward the perfecting of sample cars or even toward placing it into production if I can but gain your interest. In simple language I don't want the world with a fence around it, but in dis-

posing of my designs all I shall demand is a Just and Fair compensation and return for the knowledge, effort and money I have personally invested and you'll find me easy to deal with. * * * Please command me and I shall be only too glad to show you all my drawings and prove my many contentions either here in Detroit or any place you name.

"Most earnestly and respectfully submitted and in Confidence."

[3] "Dear Mr. Booth:

"During the recent National Automobile Show which was held in New York City, you had an interview with our Messrs. Schwab, Thayer and Thompson, relative to your new car design. At that time it seemed to be the concensus of opinion of our directors, that it would be unwise to continue further with you in any negotiations on this car.

"Some day next week, there will be an executive meeting held at this plant, for the purpose of discussing our future plans, and it is the desire of

matter had been revived. February 9, in anticipation of a directors' meeting at Indianapolis, Crawford wired Booth asking Booth to send colored cuts of his cars, and saying, "if we are able to renew interest we will discuss details later"; and the next day he wrote Booth expressing satisfaction that the colored drawings and detailed prints had been mailed, and referring to the expected visit of Thayer and Schmidlapp said:

"Mr. Thompson and myself are of the opinion that we can take care of your interests properly and should Messrs. Thayer and Schmidlapp desire further information we will get in touch with you immediately.

"Knowing that you appreciate our position in the matter and with many thanks for trusting us with your data, we are"

February 11 Booth wrote to Crawford, referring to blueprints mailed that morning and to color drawings also sent. It seems drawings were also sent of certain changes Booth had made, of which he said in the letter: "I might as well comment on certain of the newer notes struck in our recent designs —you'll get it all without my telling you the way you did when you first saw my prints, but no harm will come in giving you my own version on some items. I won't put them in order but just as they come to me." Then follows a long description of the details of such changes.

This somewhat extended reference to the correspondence is made (as well as the hereinafter-mentioned Crawford report) to indicate the interest which the responsible Stutz officials manifested in Booth's designs and drawings, as well as their favorable opinion of them, and the trust and confidence in which they were received and to be held by the Stutz officials.

That the Booth drawings and blueprints were turned over to Stutz in strict confidence thus abundantly appears. If Stutz violated this confidence, and wrongfully, and to its own advantage and to Booth's detriment, appropriated Booth's designs, wholly or in part,

Booth is entitled to prevail. This we decided in effect when the case was first before us. 24 F.(2d) 415. In Shellmar Products Co. v. Allen-Qualley Co., 36 F.(2d) 623, we held to same effect. In DuPont, etc., Co. v. Masland, 244 U. S. 100, 37 S. Ct. 575, 61 L. Ed. 1016, a like principle is declared.

It appears from the evidence that for some years before Moskovics became president, Stutz was losing money, and that its affairs were then at quite low ebb. Moskovics testified that when he took hold, Stutz was "dead as a door nail." There was very little production, but much material was on hand. It would seem from his testimony that when he was employed no new departure was then contemplated by Stutz, but that he was expected to "liquidate the inventory," that is, work up the stock on hand, which he estimated was enough for about 1400 cars, and sell the cars.

But it seems that immediately he became president the production of a new car was considered. He brought no plans, but, being an automotive engineer of experience, he testified he made some rough sketches, whereupon Crawford, who remained as chief engineer, exclaimed in evident surprise, "My God, I have got Booth's designs up stairs." Moskovics inquired, "You have got the whole shooting match, and the details of his car?" Crawford said, "Yes," and Moskovics then said, "Go right up stairs and pack up those drawings and get them out of here tonite, and be prepared to say I have never seen a line of them, and write him a letter and tell him the company isn't interested." Moskovics said he never saw Booth's drawings, and that Crawford never discussed with him Booth's plans, "because," as Moskovics said, "I wouldn't let him."

Moskovics testified that some years before, when he was with the Marmon Company, Mr. Marmon made sketches for an underslung worm-drive car, which was not built. Witness Marmon corroborated this, saying that country roads would not then justify cars with so little clearance.

those active here at the factory, to again call to the attention of our directors, your unusual design.

"You are aware of the fact that no one in our entire organization, with the exception of Mr. Thompson and the writer, have seen any of your drawings, and it therefore occurs to us, that our directors might consider further, and show more interest in your proposition, if we had in our possession the line drawings and wash drawings which you have previously shown us.

"It is impossible for us to say today just what day next week we will be able to get together, but as it is the wish of Mr. Thompson and the writer to present your drawings, etc., to our directors when they arrive, we would appreciate it very much

if you would express to us such drawings as you have.

"We assure you that these drawings will be shown only to those controlling this business, and we will not make any copies of same of any nature.

"Your design is so unique in many ways that it would be impossible to convey what you have in mind, to others, without the use of these drawings, and we trust that you will cooperate with Mr. Thompson and the writer in permitting us to have them in our possession for a very short period.

"We have a great many things to discuss among ourselves, and after we have definitely outlined the policy of procedure we will return the drawings to you immediately, and advise you further."

Thompson testified that when he was showing Moskovics around the plant, and the production of a new car was being talked of, he explained to Moskovics, and they discussed, the principles of Booth's designs as submitted, Thompson saying that Booth's project had been turned down but not because of any objection to the car itself.

Crawford testified to the confidential nature of the dealings between Booth and Stutz, and that on February 19, two days after Moskovics took hold, while discussing with Moskovics the production of a new car he (Crawford) mentioned the fact that Booth's plans were still there, and that thereupon Crawford returned the plans to Booth with a letter to him of the 19th.[4]

The plans were returned as stated in the letter. The statement in the letter that the company then had other plans which they did not wish to sacrifice is scarcely borne out by the facts; for it does not appear that up to that time Stutz or its officers had matured any new plans.

Crawford and Moskovics, however, proceeded at once to design for Stutz a new car, and this work progressed so rapidly that early in 1926 the cars were ready for the market. Their cars scored an immediate success, and the Stutz losses of the preceding years were followed by substantial profits for several years next following.

· Crawford was very positive in his testimony that he knew nothing about the Booth car except as above stated, and that in the production of the new car he had no benefit or suggestion from Booth's designs and drawings. If this be conceded, and if it be concluded that Thompson was at least mistaken when testifying to his discussion with Moskovics of Booth's car and plans, this alone

---

"'February 19 1925.
"My dear Mr. Booth:
"The colored car drawing and blueprints came to hand the middle of last week, and we have analysed these from every viewpoint.
"It is necessary for me to advise you that the Board of Directors of this Company has decided not to consider your proposition further, for the reason that they do not feel that it will fit in properly with other plans which they have in mind, and which plans they do not wish to sacrifice.
"You are to be congratulated upon the many clever ideas embodied in your layouts, and we regret that we can give you no further consideration for manufacturing such a car here. ·
"We wish to thank you for the opportunity which you have afforded us, and sincerely trust that you may have the pleasure of placing the same elsewhere at an early date.
"The blueprints and colored drawings entrusted to us are being returned today by prepaid express.
"Yours sincerely,
"Stutz Motor Car Company of America, Inc.,
"Chas. S. Crawford, Chief Engineer."

would not necessarily absolve the company. Crawford remained the chief engineer in charge of construction. True, he says it was under the general supervision of Moskovics, but there is nothing to indicate that his duties and functions were different from what the title of his office would indicate. He had charge of all the details, and it was the details, fitting into the general design, which Booth's plans and blueprints disclosed. While Crawford denies having employed these drawings and blueprints in designing the new Stutz car, this would not necessarily follow from the return of Booth's drawings, etc., just preceding the beginning of the designing of the new Stutz car.

Crawford seems from the first to have been captivated by Booth's designs and plans and pictures, and was very loath to have Stutz relinquish them. This is manifest not only from the correspondence referred to, but positively appears from Crawford's general report to his company upon Booth's "passenger car design" submitted to the company. This is a lengthy document dated October 21, 1924, covering fifteen pages, wherein Booth's car is described with much detail and with comments thereon, general and special. We quote some of that report.

"Page 1.

"Salient Features of the Scripps-Booth Design.

"1. An irresistible eye appeal, placing it in a field of design conclusively by itself, without in the least appearing freakish.

"2. Extreme low center of gravity.

"3. Maximum passenger comfort, combined with a very short wheelbase, and an unusually low car.

"4. Numerous selling features which would have unquestionable appeal to prospects, and which could not be duplicated by conventional construction.

"5. A car of this kind, carefully combed over for mechanical excellence and properly built, would undoubtedly create, almost immediately, a selected tremendous field selling organization."

Then follows the statement: "The following information covers a general survey of the detail design, in alphabetical order." Booth's front axle, the report says, "has many advantages"—specifying them. Of the rear axle, the report says that it "is, to all intents and purposes, a proven conventional assembly of the worm and worm-wheel type," which are used in high-grade truck and bus

transportation, and that several notable foreign cars have used them; that this construction is necessary to obtain Booth's extremely low body floor. "The designs submitted by Mr. Booth, are what one might term 'Foreign Lines Americanized.'"

"The design of the chassis is such that the floor can be built unusually low, that is, very close to the ground. With this as a starting point the cushions can be built higher than is the usual practice in low cars today, and on account of this additional cushion height, seats can be set closer together, fore and aft, thus eliminating unnecessary wheelbase. Mr. Booth's designs disclose the fact that more passenger room and comfort can be obtained with his construction, than that which exists in any other car today, and the extreme height from the ground to the roof does not exceed six feet. This combination gives a low rakish appearance, with a seating position and head room equal to that of the large Pierce-Arrow Limousine."

The report described the brakes, clutch, engine, electric equipment, fenders, gasoline tank, radiator, springs, steering gear, transmission, etc., and proceeds:

"I am informed that Mr. D. McCall White, formerly Chief Engineer of the Cadillac and LaFayette Companies, has assisted Mr. Booth in this design, primarily from the mechanical end. I have personally known Mr. White for a number of years, and consider him one of the most capable engineers in this country today.

"I am of the firm belief that this Company is in need of an innovation in design, and that it would be well worth the time and money spent, to continue negotiations with Mr. Booth, to the end that we may find what his definite proposition is, thereby being in a position to settle this matter definitely one way or the other at a very early date."

Crawford signs the report: "Stutz Motor Car Company of America, Inc. Chas. S. Crawford Production Manager & Chief Engineer."

There were further conferences between Booth and Crawford and other correspondence respecting particular details, during which Crawford received from Booth, and with Booth's consent retained, a series of etchings illustrating the car.

With this knowledge of the Booth designs, and with the purpose of producing a car which proved to be generally similar in design, is it at all likely that Chief Engineer Crawford entirely banished from his mind the Booth plans, specifications, designs, and drawings, which only a short time before he had so intimately examined, and in such detail had approvingly reported upon? If Crawford's denial be accepted, and he be absolved from any purposeful appropriation for Stutz of any part of the Booth designs or plans, the influence of the Booth designs upon the new Stutz car must have been the result of Crawford's "unconscious assimilation" of them, which, however wanting in intent, none the less constituted an appropriation of the Booth designs so far as their novel features entered into the new Stutz car, involving none the less a breach of the trust and confidence under which Booth's plans and designs were turned over to Stutz.

True, the Booth blueprints and designs were not literally copied in their every detail. There were many departures, more or less substantial. But salient features mentioned in Crawford's report were undoubtedly incorporated in the Stutz car.

The under-slung worm drive with up-kicked frames was open to all, but, when incorporated in a car, required such rearrangement of parts as the judgment of each designer might suggest. Booth had designed such arrangement peculiar to his car as resulted in an artistic symmetry which gave to the car what Crawford termed an "irresistible eye appeal, placing it in a field of design exclusively by itself."

It is apparent from the evidence that the arrangement of the Stutz car was in many ways similar, effecting for it an "eye appeal" much like that of the Booth car. Notwithstanding dissimilarities in many of the corresponding parts, the general resemblance is far too marked to warrant the conclusion that the Booth designs did not quite substantially enter into the Stutz car.

To the extent, therefore, that the Booth plans, communicated in confidence to Stutz, did enter into the design of the Stutz car, Stutz did inequitably appropriate those plans, and should account to Booth therefor. By this we do not mean that Stutz should account for and Booth should receive all profits which accrued to Stutz from its new car. Had the Booth patent been sustained, the measure of Booth's recovery would of course be decidedly different. But, as we have held, the lower center of gravity, made possible by the under-slung worm drive, was a matter of selection in the designing of a car, and was open to Stutz quite regardless of Booth's design. That very important feature, thus open to all, contributed materially to the "eye ap-

peal" of both cars, and as well to the ready market for the new Stutz car; and recovery may not be predicated thereon. So also as to the up-kicked members of the chassis, and the number and location of its cross bars. Indeed, notwithstanding Booth's claim in the Schwab letter of ownership of "the patents, the patent license and all the designs for the car," the record discloses no patent on car or design save that which is above held to be invalid; and no license save a license to use in his car the "Argyle" motor—which it does not appear Stutz employed.

But the Booth plans evidently did in some measure facilitate the production of the Stutz car, as well as the earlier placing of that car upon the market; and to whatever extent it may appear that the Booth designs, apart from those features of them which were common property, contributed to the success of the Stutz car, as well as to the extent that it may appear that Booth through Stutz's inequitable appropriation was harmed, Booth should have recovery against Stutz.

The individual appellees deny their personal liability. It does not appear that the New York directors had any special knowledge of automobiles, or any interest or part in the matter save in their capacity as directors and stockholders of the Stutz Company. In the voluminous correspondence with Booth, Thompson signed his communications as president of Stutz, and Crawford's were signed with the corporation name with himself as chief engineer. They do not appear to have had any personal motive or advantage. Twyman and Bastien were not shown to have had any personal interest or motive beyond that of Stutz employees, and in our judgment neither they nor the other individual appellees were shown to have incurred any liability to Booth.

It is quite likely that upon the record this court could about as fairly approximate the proper amount of such recovery as might be done after remandment and the hearing of further evidence thereon. While it would be desirable to avoid the usual long delay and great expense of such further hearing and possible reference, the record indicates that on the hearing the parties may not have adduced all their evidence bearing on the amount of any recovery, and we do not wish to deprive either party of such opportunity. Accordingly, we conclude that this case should be remanded for ascertainment of the amount of Booth's recovery against Stutz.

It is ordered that in cause No. 1048 (District Court), involving the patent, the decree of the District Court be affirmed; and that in cause No. 1004 (District Court), involving inequitable appropriation of Booth's designs, the decree of the District Court be reversed, and the cause remanded to the District Court with direction for further proceedings in conformity with this opinion.

The costs of this appeal shall be borne equally by appellant and appellee Stutz.