**Howard R. DUFFY, III, and James P. Duffy, d/b/a Retirement Report Card, Plaintiffs,**

v.

**CHARLES SCHWAB & CO., INC., Defendant.**

Civil Action No. 98–4595(MLC).

United States District Court, D. New Jersey.

May 4, 2000.

Gregory S. Gewirtz, Charles P. Kennedy, Robert J. Scheffel, Lerner, David, Littenberg, Krupholz & Mentlik, LLP, Westfield, NJ, for Plaintiffs.

Ellis I. Medoway, Archer & Greiner, A Professional Corp., Haddonfield, NJ, David Henry Dolkas, pro hoc vice, Gray Cary Ware & Freidenrich LLP, Palo Alto, CA, for Defendant.

### MEMORANDUM OPINION

COOPER, District Judge.

This matter comes before the Court on a motion for partial summary judgment by defendant Charles Schwab & Co., Inc. ("Schwab") pursuant to Federal Rule of Civil Procedure 56 seeking dismissal of the third and fifth claims for relief of plaintiffs Howard R. Duffy, III and James P. Duffy (collectively "Duffy"), which allege statutory and common law unfair competition and trademark infringement, respectively. Duffy's trademark infringement claim must fail because Duffy's limited use of the mark "MUTUAL FUND REPORT CARD" did not constitute prior use in commerce sufficient to establish rights in the mark and did not establish secondary meaning in the marketplace as a matter of law. However, Duffy's unfair competition claim under New Jersey law survives summary judgment because Duffy has set forth a genuine issue of material fact regarding whether Schwab misappropriated his "confidential and proprietary" information.

### BACKGROUND

In approximately 1994, Duffy sought to form a strategic partnership with the American Association of Retired Persons ("AARP"), Morningstar (a leading supplier of mutual fund data), and Jane Bryant Quinn (a well-known financial writer) to offer an exclusive financial product called the Retirement Report Card ("RRC") to AARP's members. (Certif. of David Henry Dolkas, Esq. dated 2–24–00 ("Dolkas Certif.") Ex. 1: Dep. of Howard and James Duffy ("Duffy Dep.") at 23, 51.) The RRC would depict asset allocation and risk and itemize the fees and performance of a particular mutual fund. (Duffy Dep. at 42.) AARP stated that it would not consider Duffy's proposal because Duffy had not provided proof of his financial integrity and his ability to fund such an enterprise. (Dolkas Certif. Ex. 2.) Jane Bryant Quinn also rejected Duffy's proposal because she did not want to be featured in a business she did not control and she had no interest in controlling Duffy's business. (Dolkas Certif. Ex. 3.)

Following AARP's initial rejection, Duffy contacted start-up business divisions within two large accounting firms, Ernst & Young and, later, Arthur Anderson about securing initial funding for his company. (Duffy Dep. at 51–52.) Duffy was not successful in obtaining such funding. (Duffy Dep. at 217–21). In January 1997, after several attempts by Duffy to consummate a relationship with AARP, Duffy was told by AARP that it had no interest in an exclusive arrangement with Duffy. (*Id.* at 199–200.) Thereafter, Duffy abandoned his efforts to establish a relationship with AARP. (*Id.*)

On or about February 28, 1997, Howard Duffy called Schwab and spoke to Emma Leybin ("Leybin"), the administrative assistant to John Philip Coghlin, seeking to

license financial products called the Mutual Fund Profile and the Mutual Fund Report Card to Schwab. (Decl. of Howard R. Duffy dated 2–7–00 ("Duffy Decl.") ¶ 3.) Leybin suggested that Duffy prepare a formal presentation and submit it for consideration by David S. Pottruck ("Pottruck"), the President of Schwab. (Id. ¶ 3.) Pursuant to this request, Duffy prepared a detailed business plan and a research report. (Id. ¶ 4.)

In June 1997, Duffy sent a proposal (the "Proposal"), along with the business plan, research report and other materials, all marked "Proprietary and Confidential," to Pottruck. (Dolkas Certif. Ex. 4; Duffy Decl. Ex. A.) In the Proposal, Duffy proposed a licensing arrangement by which Schwab would obtain licensing rights to the Mutual Fund Profile and the Mutual Fund Report Card. (Duffy Decl. ¶ 2 & Ex. A; Dolkas Certif. Ex. 4.) These products would provide concise summaries of mutual funds in a user-friendly format, enabling investors to objectively evaluate the performance of one or more mutual funds and compare such funds to others in the same peer group. (Duffy Decl. ¶ 2 & Ex. A; Dolkas Certif. Ex. 4.)

On July 11, 1997, Howard Duffy called Pottruck's office to follow up on Schwab's interest in the Proposal. (Duffy Decl. ¶ 6.) Pottruck's secretary confirmed receipt of the Proposal and informed Duffy that it had been forwarded to Tim McCarthy ("McCarthy") of Schwab for further consideration. (Id.) Duffy followed up by calling McCarthy's office. (Id.) McCarthy's assistant, Gillian Peoples ("Peoples"), told Duffy that the Proposal had been lost and asked Duffy to resubmit the information to her. (Id.). Duffy resubmitted the Proposal to Peoples on July 14, 1997. (Id.)

On August 20, 1997, Duffy returned a call he received from Michelle Swenson ("Swenson"), Senior Vice President of Investment Products and Mutual Fund Research. (Id. ¶ 7.) Swenson told Duffy that Schwab had decided not to use Duffy's submissions because it planned to de-velop its own paper-based product. (Id.) Swenson then stated that Schwab could use assistance in developing an on-line version of Schwab's paper-based product. (Id.)

In response to Swenson's suggestion, Duffy adapted the Proposal for on-line versions of Duffy's products and submitted the materials to Swenson on September 10, 1997. (Id. ¶ 8 & Ex. B.) Duffy spoke to Swenson again on November 11, 1997, at which time Swenson told Duffy that Schwab was no longer interested in on-line versions of the Mutual Fund Report Card and Mutual Fund Profile. (Id.)

On September 23, 1997, Schwab filed three applications for Federal Trademark Registration of the mark CHARLES SCHWAB MUTUAL FUND REPORT CARD. (Decl. of Robert J. Scheffel, Esq. dated 2–7–00 ("Scheffel Decl.") Ex. C.) Schwab began marketing the CHARLES SCHWAB MUTUAL FUND REPORT CARD on November 5, 1997. (Scheffel Decl. Ex. D: Dep. of Jeremy Ball ("Ball Dep.") at 57.)

In late 1997 and early 1998, Duffy pitched the Mutual Fund Report Card and Mutual Fund Profile to two brokerage firms, E*Trade and Waterhouse Securities. (Duffy Dep. at 148–53.) Neither firm was interested in licensing Duffy's products. (Id. at 150, 162.) Duffy has not sent the Proposal to any other brokerage firms. (Id. at 162–63.)

In September 1998, Duffy applied for a trademark registration for the mark MUTUAL FUND REPORT CARD. (Dolkas Certif. Ex. 6.) The Patent and Trademark Office denied Duffy's application stating that the words contained in the mark were "merely descriptive" and Duffy failed to demonstrate that the marks were used in commerce. (Id. Ex. 7.)

Duffy has not sold any product or service using the MUTUAL FUND REPORT CARD or MUTUAL FUND PROFILE marks to the public. (Dolkas Certif. Ex. 5.) In addition, Duffy has not derived any

revenue from the sale or licensing of any product or service with the MUTUAL FUND REPORT CARD or MUTUAL FUND PROFILE marks. (*Id.*) Aside from Duffy's delivery of proposals to AARP, Schwab, E*Trade, and Waterhouse Securities, Duffy did not advertise its product to potential customers or licensees. (Duffy Dep. at 227–32.) In addition, Duffy has not licensed rights to the MUTUAL FUND REPORT CARD or MUTUAL FUND PROFILE to any third party. (*Id.* at 228–29.)

Duffy filed a Complaint in this Court on October 2, 1998 asserting five counts. (Compl.) Counts one, two, and four relate to Schwab's alleged misappropriation of the ideas contained in the Proposal, which were alleged to have been submitted to Schwab in confidence. (*Id.*) Counts three and five primarily relate to Schwab's alleged unlawful use of Duffy's mark, MUTUAL FUND REPORT CARD, in commerce. (*Id.*) Duffy alleges that it is entitled to injunctive and compensatory relief under count three for unfair competition pursuant to the New Jersey Fair Trade Act, N.J. Stat. Ann. ("N.J.S.A.") § 56:4–1, and New Jersey common law, and under count five for trademark infringement under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). Schwab's motion for partial summary judgment seeks dismissal of counts three and five only.

## DISCUSSION

Federal Rule of Civil Procedure 56(c) provides that summary judgment is proper "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The party moving for summary judgment bears the initial burden of showing that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548,

91 L.Ed.2d 265 (1986). Once the moving party has met its initial burden, the nonmoving party must present evidence that creates a genuine issue of material fact making it necessary to resolve the difference at trial. *Id.* at 324, 106 S.Ct. 2548. "By its very terms, the standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Material facts are only those facts that might affect the outcome of the action under governing law. *Id.* at 248, 106 S.Ct. 2505; *Boyd v. Ford Motor Co.*, 948 F.2d 283, 285 (6th Cir.1991).

Moreover, the role of the judge at the summary judgment stage is not to weigh the evidence, but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505. "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Id.* at 249–50, 106 S.Ct. 2505 (citation omitted).

The Court will first address Schwab's argument that count five of the Complaint, which alleges trademark infringement under the Lanham Act, should be dismissed. Thereafter, the Court will address Schwab's argument that count three of Duffy's complaint, which alleges unfair competition under New Jersey's Fair Trade Act and common law, should be dismissed.

### I. Plaintiff's Trademark Infringement Claim

■ To prevail on a claim for trademark infringement, a party must prove that: (1) the mark is valid and legally protectable; (2) the mark is owned by the plaintiff; and (3) the defendant's use of the mark to

identify goods or services is likely to create confusion concerning the origin of the goods or services. *Fisons Horticulture, Inc. v. Vigoro Indus., Inc.,* 30 F.3d 466, 472 (3d Cir.1994). For the reasons set forth below, the evidence, taken in the light most favorable to Duffy, demonstrates that there are no genuine issues of material fact and that Schwab is entitled to judgment as a matter of law with respect to count five of the Complaint. The Court will first address the second element of Duffy's trademark infringement claim, whether Duffy owns the mark "Mutual Fund Report Card."

### A. Whether the Mark is Owned by Plaintiff

"Trademark law protects owners in the exclusive use of their marks when use by another is likely to cause confusion." *Lucent Information Management, Inc. v. Lucent Technologies, Inc.,* 186 F.3d 311, 315 (3d Cir.1999). In considering whether Duffy owns the mark "MUTUAL FUND REPORT CARD," the question before us is whether a reasonable trier of fact could find that Duffy's activities prior to November 5, 1997,[1] the date Schwab first began actively marketing the CHARLES SCHWAB MUTUAL FUND REPORT CARD, (Pl.'s Brief in Opp'n at 7), established prior rights in the mark through use in commerce. *Lucent,* 186 F.3d at 315.

■ The Third Circuit measures "use" by the four-factor test first articulated in *Natural Footwear, Ltd. v. Hart, Schaffner & Marx,* 760 F.2d 1383, 1397 (3d Cir.1985), to determine whether the market penetration of a mark is sufficient to warrant trademark protection: (1) the volume of sales of the trademarked product; (2) the growth trends (both positive and negative) in the area; (3) the number of persons actually purchasing the product in relation

to the potential number of customers; and (4) the amount of product advertising in the area. *Id.* at 316–17.

■ Applying this test, the Court finds that Duffy has not established prior rights in the mark through use in commerce and thus does not have an ownership interest in the mark. As to the first factor, sales volume must be more than de minimis. *Id.* at 317. Duffy has not sold any product or service using the MUTUAL FUND REPORT CARD to the public. (Dolkas Certif. Ex. 5.) Duffy has not derived any revenue from the sale or licensing of any product or service with the MUTUAL FUND REPORT CARD mark. (*Id.*)

The Court cannot review growth trends, the second factor in the four-factor test, because Duffy made no sales in the period before Schwab's commercial use of the mark. *Lucent,* 186 F.3d at 317. For the same reason, the Court cannot calculate the ratio of existing customers to potential customers, the third factor in the test. *Id.*

As to the fourth and final factor, advertising and promotion, aside from Duffy's delivery of proposals to AARP, Schwab, E*Trade, and Waterhouse Securities, Duffy did not advertise its product to potential customers or licensees, (Duffy Dep. at 227–32), and Duffy has not licensed rights to the MUTUAL FUND REPORT CARD to any third party. (*Id.* at 228–29.) The law only protects a party's goodwill and business, not a party's intention to create goodwill and business. *Lucent,* 186 F.3d at 318. Duffy's showing of use of its mark was considerably less than that made by the plaintiff in *Lucent,* where the Third Circuit affirmed the granting of summary judgment based on the lack of plaintiff's commercial use of its mark. *Id.* Contrary to Duffy's argument in its brief, distribution of samples to a few companies without more does not constitute a sufficient bona

---

1. There is no indication in the record whether Schwab filed an intent to use application with the United State Patent and Trademark Office. If Schwab did, Duffy would have to prove its use of its mark before this earlier date. Because the Court finds that Duffy has never used its mark in commerce sufficient to convey ownership rights to the mark, the actual date is not material.

fide use in commerce. For the reasons set forth above, no rational fact finder could conclude that Duffy had established prior rights in the mark through use in commerce. Thus, the Court holds that Duffy does not have an ownership interest in the mark.[2] We will therefore grant summary judgment as to Duffy's fifth claim. Although we could end our analysis here, we will also address whether Duffy's mark is valid and legally protectable.

### B. Whether the Mark is Valid and Legally Protectable

The Lanham Act protects unregistered marks to the same extent as registered marks because trademark rights emanate from use and not merely registration. *See, e.g., 800 Spirits Inc. v. Liquor By Wire, Inc.,* 14 F.Supp.2d 675, 678 (D.N.J.1998) (citing *Two Pesos, Inc. v. Taco Cabana, Inc.,* 505 U.S. 763, 768, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992)); *Harlem Wizards Entertainment Basketball, Inc. v. NBA Properties, Inc.,* 952 F.Supp. 1084, 1092 (D.N.J.1997). If the mark has not been federally registered, however, the mark is only valid and legally protectable if the plaintiff shows that the mark is inherently distinctive or has secondary meaning, i.e. there is consumer recognition that the mark identifies the source of the service or product.[3] *Id.*

The scope of protection of an unregistered mark depends on the distinctiveness of the mark. *Id.* Third Circuit law evaluates marks along a continuum of distinctiveness, from inherently distinctive to nondistinctive, as follows:

1. arbitrary or fanciful terms, which bear no logical or suggestive relation to the actual characteristics of the goods or services;

2. suggestive terms, which suggest rather than describe the characteristics of the goods or services;

3. descriptive terms, which describe a characteristic or ingredient of the goods or services to which they refer; and

4. generic terms, which function as the common descriptive name of a product or service class.

*A.J. Canfield Co. v. Honickman,* 808 F.2d 291, 296 (3d Cir.1986); *800 Spirits Inc.,* 14 F.Supp.2d at 678–79. Arbitrary, fanciful, and suggestive marks (categories one and two) are deemed inherently distinctive and thus entitled to full protection (at least in those geographic and product areas in which the senior user applies the mark to its goods).[4] *See Sklar,* 967 F.2d at 855; *800 Spirits Inc.,* 14 F.Supp.2d at 679 (quoting *Mil–Mar Shoe Co. v. Shonac Corp.,* 75 F.3d 1153, 1156 (7th Cir.1996)). Descriptive marks (category three) are less distinctive and thus are protected only

---

2. Duffy argues that its failure to derive revenue from its product was due to Schwab's "blatant misappropriation of Duffy's trademark and other submitted materials .... [and that] Schwab's introduction of Duffy's submission into the marketplace destroyed Duffy's ability to market [its] product...." (Pl.'s Br. in Opp'n at 14–15.) No cause of action exists for misappropriation of a trademark. 2 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition, § 10:72, at 10–136 to –137 (2000). Trademark rights are established by a party's use of a mark in commerce. *Lucent,* 186 F.3d at 315. Thus, a party acquires no "property" right in a mark until it has used the mark in commerce.

3. Unlike registered marks, unregistered marks have no presumption of validity; there-

fore, a plaintiff has the burden of proving that its unregistered mark is protectable. *See Dranoff–Perlstein Associates v. Sklar,* 967 F.2d 852, 857 n. 11 (3d Cir.1992); *A.J. Canfield Co. v. Honickman,* 808 F.2d 291, 297, 299 n. 9 (3d Cir.1986).

4. "[T]he suggestive, arbitrary, or fanciful mark is entitled to automatic protection, as there exists a vast universe of equivalent alternatives (or, in the case of suggestive marks, at least a vast number of possible alternatives) to choose from, and the consumer will reasonably immediately identify the mark for what it is—a source indicium and no more." *Duraco Prods., Inc. v. Joy Plastic Enter.,* 40 F.3d 1431, 1442 (3d Cir.1994).

if the mark has achieved "secondary meaning" in the relevant community.[5] *See id.* Finally, generic marks (category four) are nondistinctive and thus receive no protection because a party may not deprive competitors of the right to call a good or service by its name.[6] *See id.*

The Court finds as a matter of law that Duffy's mark is not arbitrary or fanciful because "MUTUAL FUND REPORT CARD" clearly bears some "logical or suggestive relation" to the good and/or service supplied by Duffy. *See Sklar,* 967 F.2d at 857.

In addition, the Court finds as a matter of law that the mark is not suggestive. The most popular test for determining whether a mark is suggestive or descriptive (or generic) is the "imagination test." *Id.* at 857–58 (citing 1 J. Thomas McCarthy, Trademarks and Unfair Competition § 11.21, at 491 (2d ed.1984)).

> A term is suggestive if it requires imagination, thought or perception to reach a conclusion as to the nature of the goods [or services]. A term is descriptive [or generic] if it forthwith conveys an immediate idea of the ingredients, qualities or characteristics of the goods [or services].

*Id.* at 858 (quoting *A.J. Canfield,* 808 F.2d at 297). Under this test, Duffy's mark is not suggestive because little imagination is needed to reach a conclusion as to the nature of the goods and/or services provided by Duffy. Instead, the term "MUTUAL FUND REPORT CARD" forthwith conveys an immediate idea of the characteristic of the goods and/or services provided. *See id.*

The Court need not determine whether "Mutual Fund Report Card" is descriptive or generic because, even if "Mutual Fund Report Card" is descriptive, no rational jury could find that Duffy's use of the "Mutual Fund Report Card" mark has achieved "secondary meaning" in the marketplace. *See Sklar,* 967 F.2d at 855 (noting that a party must show mark has "secondary meaning" in marketplace for descriptive mark to receive trademark protection). Because rights by secondary meaning are gained solely by public recognition and association, the test is not simply one of who used the mark first chronologically but how the buying public has come to interpret the plaintiff's mark. *See* 2 McCarthy, *supra,* § 16:34 at 16–43.

■ "Secondary meaning is demonstrated where, 'in the minds of the public, the primary significance of a product feature or term is to identify the source of the product itself.'" *Ford Motor Co. v. Summit Motor Prods., Inc.,* 930 F.2d 277, 292 (3d Cir.1991) (quoting *Freixenet, S.A. v. Admiral Wine & Liquor Co.,* 731 F.2d 148, 152 (3d Cir.1984)). Factors that may be used to determine whether secondary meaning has been demonstrated include: (1) the extent of sales and advertising leading to buyer association, (2) length of use, (3) exclusivity of use, (4) the fact of copying, (5) customer surveys, (6) customer testimony, (7) the use of the mark in trade journals, (8) the size of the company, (9) the number of sales, (10) the number of customers, and (11) actual confusion. *Id.*

---

5. Although a descriptive trademark leaves a smaller finite set of equivalent alternatives, it can still be protected because there are adequate alternatives for competitors, but only if it has acquired secondary meaning so that it demonstrably functions as a source indicium. *Duraco,* 40 F.3d at 1442. "[T]he automatic exclusion of a descriptive term from commercial use 'would be commercially disruptive and unfair to competitors.'" *Sklar,* 967 F.2d at 858 (quoting *Security Ctr., Ltd. v. First Nat'l Security Ctrs.,* 750 F.2d 1295, 1300 (5th Cir. 1985)).

6. A generic mark is a word or phrase that has so few alternatives (perhaps none) for describing the good or service that to allow someone to monopolize the word or phrase would debilitate competitors. *Duraco,* 40 F.3d at 1442. "Generic terms are denied trademark protection because granting one firm their exclusive use would place competitors at a serious competitive disadvantage." *Sklar,* 967 F.2d at 857 (citing 1 Jerome Gilson, Trademark Protection and Practice § 2.02, at 2–23 (1991)).

■ Duffy has not sold any product or service using the MUTUAL FUND REPORT CARD mark to the public nor derived any revenue from the sale or licensing of any product or service with the MUTUAL FUND REPORT CARD mark. (Dolkas Certif. Ex. 5.) Aside from Duffy's delivery of proposals to AARP, Schwab, E*Trade, and Waterhouse Securities, Duffy did not advertise its product to potential customers or licensees, (Duffy Dep. at 227–32), and Duffy has not licensed rights to the MUTUAL FUND REPORT CARD to any third party. (*Id.* at 228–29.) In addition, there is evidence in the record that "mutual fund report card" has been used in the media to refer to the product or service without relation to any product brand. (*See* Dolkas Decl., Ex. 7.) Duffy has submitted no evidence in opposition to Schwab's motion to suggest that Duffy's use of the mark "MUTUAL FUND REPORT CARD" has achieved secondary meaning in the marketplace. Accordingly, no rational jury could find that the relevant consuming public would identify Duffy (or a single source emanating from Duffy) as the source of the product or service. *See Lucent,* 186 F.3d at 315, 317 (holding that no reasonable trier of fact could find defendant's activities established prior rights in mark through use in commerce); *A.J. Canfield,* 808 F.2d at 299. Therefore, we find that Duffy's mark is not valid or legally protectable.

For the foregoing reasons, the Court holds that the evidence, taken in the light most favorable to Duffy, demonstrates that there are no genuine issues of material fact and that Schwab is entitled to summary judgment with respect to count five of the Complaint.

## II. Plaintiff's Unfair Competition Claims

■ Duffy asserts unfair competition claims under New Jersey common law and N.J.S.A. § 56:4–1.[7] New Jersey's "law of unfair competition is an amorphous area of jurisprudence. It knows of no clear boundaries.... The concept is as flexible and elastic as the evolving standards of commercial morality demand." *New Jersey Optometric Ass'n v. Hillman–Kohan Eyeglasses, Inc.,* 144 N.J.Super. 411, 427, 365 A.2d 956 (Ch.Div.1976). "[T]he tendency of the law [in this area] 'has been in the direction of enforcing increasingly higher standards of fairness or commercial morality in trade.'" *Q–Tips, Inc. v. Johnson & Johnson,* 206 F.2d 144, 145 (3d Cir.1953) (quoting Restatement, Torts, Vol. III, P. 540) (quoted in *Squeezit Corp. v. Plastic Dispensers,* 31 N.J.Super. 217, 221, 106 A.2d 322 (App.Div.1954)).

Although it is impossible to categorize all acts which constitute unfair competition, there are a few fundamental elements that are definite. In essence, unfair competition is a business tort. Generally it consists of the misappropriation of one's property by another—or property which has some sort of commercial or pecuniary value. The misappropriation usually takes the form of

7. N.J.S.A. § 56:4–1 states: "No merchant, firm or corporation shall appropriate for his or their own use a name, brand, trade-mark, reputation or goodwill of any maker in whose product such merchant, firm or corporation deals." The parties have not attempted to distinguish between the elements comprising Duffy's unfair competition claim under New Jersey common law and Duffy's claim based upon N.J.S.A. § 56:4–1. (Pl.'s Br. in Supp. at 26; Def.'s Br. in Opp'n at 18.) At least one court has stated that N.J.S.A. § 56:4–1 codified the common law authority of unfair competition. *National Football League Properties, Inc. v. New Jersey Giants, Inc.,* 637 F.Supp.

507, 519 (D.N.J.1986). *But cf. Columbia Broadcasting System, Inc. v. Melody Recordings, Inc.,* 134 N.J.Super. 368, 375, 341 A.2d 348 (App.Div.1975) (stating that prior version of N.J.S.A. § 56:4–1 "does [not] attempt to regulate different unfair practices which have historically been reached by common law precepts" in holding that N.J.S.A. § 56:4–1 "does not, by negative implication, immunize from judicial concern business or commercial conduct, which is injurious and otherwise unfair, improper or wrongful.") Without deciding that the elements of these claims are identical, the Court will treat them as such in deciding this motion.

'palming off' another's goods as your own, although the modus operandi is not essential.

*Hillman–Kohan,* 144 N.J.Super. at 427–28, 365 A.2d 956 (citations omitted). Some acts that constitute unfair competition have been described as follows:

> either that the means used are dishonest, or that, by imitation of name or device, there is a tendency to create a confusion in the trade, and enable the seller to pass off upon the unwary his goods as those of another, and thereby deceive the purchaser; or that, by false representation, it is intended to mislead the public, and induce them to accept a spurious article in the place of one they have been accustomed to use.

*Squeezit,* ·31 N.J.Super. at 221–22, 106 A.2d 322 (quoting *Vitascope Co. v. U.S. Phonograph Co.,* 83 F. 30, 32 (1897)).

> In the absence of a patent [or copyright], there is nothing to prevent the imitation or reproduction of a product provided the imitator does not misrepresent to the public that his product is made by others or cause confusion as to whose product it is or that the product has not yet acquired secondary meaning or an identification coming from appearance. , *Of course, where the imitation is obtained by fraud or breach of confidential relation, the copying will be enjoined.*

*Id.* at 222, 106 A.2d 322 (internal citations omitted) (emphasis added) (citing with approval *Booth v. Stutz Motor Car Co. of America,* 56 F.2d 962 (7th Cir.1932)) (holding that designer whose plans were communicated confidentially to automobile manufacturer was entitled to accounting of damages and profits to extent that novel features of such plans contributed to car's success); *see also Hoffman–La Roche Inc. v. Genpharm Inc.,* 50 F.Supp.2d 367, 380–81 (D.N.J.1999) (holding that misappropriation of a trade secret constitutes unfair competition under New Jersey law).[8]

■■■ Duffy alleges that Schwab misappropriated his "proprietary and confidential" proposal for the Mutual Fund Profile and the Mutual Fund Report Card by fraud and breach of a confidential relation. (Compl.¶¶ 5–12, 19–22.) In addition, Duffy has supported his allegations with proofs. (*See* Duffy Decl. ¶¶ 2–13) (testifying that Duffy formulated an idea for novel financial products developed ' through years of extensive research and monetary invest-

---

8. Schwab argues that under *SK & F, Co. v. Premo Pharmaceutical Laboratories Inc.,* 625 F.2d 1055 (3d Cir.1980), and *Eli Lilly and Co. v. Roussel Corp.,* 23 F.Supp.2d 460 (D.N.J. 1998), only two types of claims may be brought under New Jersey's unfair competition law: (1) passing off, and (2) unprivileged imitation; and that both of these claims would require Duffy to prove likely confusion in the eyes of the consuming public. (Def.'s Reply Br. in Supp. at 12.) The language of *SK & F* and *Eli Lilly* should not be read to limit the reach of New Jersey's unfair competition law to these two torts alone. *See SK & F,* Co., 625 F.2d at 1062 (referring to "the two *relevant* torts of unfair competition, passing off ... and unprivileged imitation") (emphasis added); *Eli Lilly,* 23 F.Supp.2d at 493 (referring to New Jersey's unfair competition law as "including" or "encompassing" the torts of passing off and unprivileged imitation). Further evidence of this fact is *SK & F* 's citation to cases such as *Squeezit, supra,* that do not place rigid limitations upon the type of conduct proscribed under New Jer-

sey's unfair competition law. *SK & F,* 625 F.2d at 1062

Even if unfair competition were limited to unauthorized imitation and passing off, count three would still survive summary judgment at this juncture. . Schwab argues generally that Duffy has failed to make out a claim for unfair competition based on passing off or unprivileged imitation as these claims relate · to Schwab's alleged misuse of Duffy's marks. (Def.'s Br. in Supp. at 26–27; Def.'s Reply Br. in Supp. at 11–13.) ·Schwab has not adequately briefed whether Duffy has made out a claim of passing off or unprivileged imitation under other possible theories, such as violation of copyright law or misappropriation of a trade secret. · *See, e.g., Columbia Broadcasting System, Inc. v. Melody Recordings, Inc.,* 134 N.J.Super. 368, 381, 341 A.2d 348 (App.Div. 1975) (upholding claim of unfair competition where defendant duplicated copyrighted work without permission); *Hoffman–La Roche,* 50 F.Supp.2d at 380–81 (holding that misappropriation of a trade secret constitutes unfair competition under New Jersey law).

ment, submitted a proposal detailing his ideas for the Mutual Fund Profile and the Mutual Fund Report Card to Schwab, that the proposal was marked "proprietary and confidential," that thereafter Schwab requested additional information regarding his ideas, that Duffy submitted additional information to Schwab pursuant to that request, and that shortly thereafter Schwab began marketing products substantially similar to the samples Duffy had provided to Schwab.) Accordingly, we hold that Duffy's declaration creates a genuine issue of material fact regarding whether Duffy's "proprietary and confidential" information was misappropriated by Schwab. *See Squeezit,* 31 N.J.Super. at 222, 106 A.2d 322 (noting that fraud or breach of confidential relation may provide basis for unfair competition claim); *see also Hoffman–La Roche,* 50 F.Supp.2d at 380–81 (holding that misappropriation of a trade secret constitutes unfair competition under New Jersey law). Thus, the Court will grant Schwab's motion for summary judgment as to count three of the Complaint only to the extent that the claims contained therein are based upon trademark infringement. *See* Section I, *supra,* for a discussion of the reasons why Duffy's unfair competition claims based upon trademark infringement must fail.

### CONCLUSION

For the reasons expressed above, the Court finds that Duffy has failed to provide evidence of a genuine issue of material fact with respect to count five of the Complaint and all claims alleged in count three of the Complaint that are based upon trademark infringement. The Court holds therefore that Schwab is entitled to summary judgment dismissing count five of the Complaint and dismissing all claims alleged in count three of the Complaint that are based upon trademark infringement.