**Howard R. DUFFY, III, and James P. Duffy, d/b/a Retirement Report Card, Plaintiffs,**

v.

**CHARLES SCHWAB & CO., INC., Defendant.**

No. CIV. A. 98–4595(MLC).

United States District Court, D. New Jersey.

Dec. 21, 2000.

Gregory S. Gewirtz, argued, Charles P. Kennedy, Robert J. Scheffel, Lerner, David, Littenberg, Krupholz & Mentlik, LLP, Westfield, NJ, Attorney for Plaintiffs.

Ellis I. Medoway, Archer & Greiner, A Professional Corporation, Haddonfield, NJ, Attorney for Defendant.

David Henry Dolkas, argued, Gray Cary Ware & Freidenrich LLP, Palo Alto, CA, Attorney for Defendant, pro hoc vice.

## MEMORANDUM OPINION

COOPER, District Judge.

This matter comes before the Court on a motion for partial summary judgment by defendant Charles Schwab & Co., Inc.

("Schwab") pursuant to Federal Rule of Civil Procedure 56 seeking dismissal of the first through fourth claims for relief of plaintiffs Howard R. Duffy, III ("H. Duffy") and James P. Duffy (collectively "Duffy"), which allege misappropriation, unjust enrichment, statutory and common law unfair competition, and breach of an implied contract, respectively. For the reasons expressed below, Duffy's misappropriation, unjust enrichment and unfair competition claims under New Jersey law must be dismissed because Duffy's ideas for the Mutual Fund Report Card and Mutual Fund Profile were not novel. However, Duffy's breach of an implied contract claim under New Jersey law survives summary judgment because genuine issues of material fact exist regarding whether Duffy's idea was novel to Schwab and whether Schwab used Duffy's idea to improve its own mutual fund report.

## BACKGROUND

The background facts have been set forth in this Court's Memorandum Opinion dated May 4, 2000,[1] and in the interest of brevity are incorporated by reference herein. In approximately 1994, Duffy sought to form a strategic partnership with the American Association of Retired Persons ("AARP"), Morningstar (a leading supplier of mutual fund data), and Jane Bryant Quinn (a well-known financial writer) to offer an exclusive financial product called the Retirement Report Card ("RRC") to AARP's members. *Duffy v. Charles Schwab & Co.*, 97 F.Supp.2d 592, 594 (2000). The RRC would depict asset allocation and risk and itemize the fees and performance of a particular mutual fund. *Id.* AARP stated that it would not consider Duffy's proposal because Duffy had not provided proof of his financial integrity and his ability to fund such an enterprise. *Id.* Jane Bryant Quinn also rejected Duffy's proposal because she did not want to

be featured in a business she did not control and she had no interest in controlling Duffy's business. *Id.*

Following AARP's initial rejection, Duffy contacted start-up business divisions within two large accounting firms, Ernst & Young and, later, Arthur Anderson, about securing initial funding for his company. *Id.* Duffy was not successful in obtaining such funding. *Id.* In January 1997, after several attempts by Duffy to consummate a relationship with AARP, Duffy was told by AARP that it had no interest in an exclusive arrangement with Duffy. *Id.* Thereafter, Duffy abandoned his efforts to establish a relationship with AARP. *Id.*

On or about February 28, 1997, H. Duffy called Schwab and spoke to Emma Leybin ("Leybin"), the administrative assistant to John Philip Coghlin, seeking to license financial products called the Mutual Fund Profile and the Mutual Fund Report Card to Schwab. *Id.* at 594–95. Leybin suggested that Duffy prepare a formal presentation and submit it for consideration by David S. Pottruck ("Pottruck"), the President of Schwab. *Id.* at 595. Pursuant to this request, Duffy prepared a detailed business plan and a research report. *Id.*

In June 1997, Duffy sent a proposal (the "Proposal"), along with the business plan, research report and other materials, all marked "Proprietary and Confidential," to Pottruck. *Id.* In the Proposal, Duffy proposed a licensing arrangement by which Schwab would obtain licensing rights to the Mutual Fund Profile and the Mutual Fund Report Card. *Id.* These products would provide concise summaries of mutual funds in a user-friendly format, enabling investors to objectively evaluate the performance of one or more mutual funds and compare such funds to others in the same peer group. *Id.*

1. This opinion was reported as *Duffy v. Charles Schwab & Co.*, 97 F.Supp.2d 592 (2000).

On July 11, 1997, H. Duffy called Pottruck's office to follow up on Schwab's interest in the Proposal. *Id.* Pottruck's secretary confirmed receipt of the Proposal and informed Mr. Duffy that it had been forwarded to Tim McCarthy ("McCarthy") of Schwab for further consideration. *Id.* H. Duffy followed up by calling McCarthy's office. *Id.* McCarthy's assistant, Gillian Peoples ("Peoples"), told H. Duffy that the Proposal had been lost and asked Duffy to resubmit the information to her. *Id.* Duffy resubmitted the Proposal to Peoples on July 14, 1997. *Id.*

On August 20, 1997, H. Duffy returned a call he received from Michelle Swenson ("Swenson"), Senior Vice President of Investment Products and Mutual Fund Research. *Id.* Swenson told H. Duffy that Schwab had decided not to use Duffy's submissions because it planned to develop its own paper-based product. *Id.* Swenson then stated that Schwab could use assistance in developing an on-line version of Schwab's paper-based product. *Id.* H. Duffy responded that he would prepare and submit additional confidential materials for an on-line version of Duffy's products. (*See* Decl. of Howard R. Duffy, III filed 7–6–00 ("Duffy Decl.") ¶ 14.) Swenson confirmed that Schwab would continue to maintain the confidential nature of Duffy's materials. (*Id.*) During the conversation, H. Duffy disclosed to Swenson two "proprietary" features of the proposed products and marketing plan that could be successfully used for an on-line version: (1) the concept of offering Schwab's customers the first three reports for free with a modest charge for additional reports, and (2) the concept of permitting a customer who used the comparison report to easily review and switch to better rated mutual funds from Schwab's SELECT LIST products (collectively the "Marketing Ideas").[2] (*See id.* ¶ 14; Decl. of James P. Duffy filed 7–6–00 ¶¶ 3–4.)

In response to Swenson's suggestion, Duffy adapted the Proposal for on-line versions of Duffy's products and submitted the materials to Swenson on September 10, 1997. *Duffy,* 97 F.Supp.2d at 594. H. Duffy spoke to Swenson again on November 11, 1997, at which time Swenson told H. Duffy that Schwab was no longer interested in on-line versions of the Mutual Fund Report Card and Mutual Fund Profile. *Id.*

On September 23, 1997, Schwab filed three applications for Federal Trademark Registration of the mark CHARLES SCHWAB MUTUAL FUND REPORT CARD. *Id.* Schwab began marketing the CHARLES SCHWAB MUTUAL FUND REPORT CARD on November 5, 1997. *Id.*

Duffy filed a Complaint in this Court on October 2, 1998 asserting five counts. *Id.* at 596. Counts One, Two, and Four primarily related to Schwab's alleged misappropriation of the ideas contained in the Proposal, which were alleged to have been submitted to Schwab in confidence. *Id.* Counts Three and Five primarily related to Schwab's alleged unlawful use of Duffy's mark, MUTUAL FUND REPORT CARD, in commerce. *Id.* On May 4, 2000, the Court entered a Memorandum Opinion, in which it held that Schwab was entitled to summary judgment dismissing Count Five of the Complaint and dismissing all claims alleged in Count Three of the Complaint that were based upon trademark infringement. *See id.* at 602. The Court refused to dismiss all claims alleged in count three, concluding that New Jersey's law of unfair competition recognizes claims for unfair competition that do not require a claimant to prove likelihood of confusion in the eyes of the consuming public, such as misappropriation of a trade secret or a confidential submission. *See id.* at 600–02.

On July 6, 2000, Schwab filed the present motion for summary judgment, seek-

---

**2.** Duffy does not allege in the Complaint that Schwab misappropriated the Marketing Ideas. Therefore, we will not address arguments raised by Duffy in its brief that Schwab misappropriated the Marketing ideas.

ing to dismiss the remaining counts of the Complaint. Schwab argues that these counts depend entirely upon whether Duffy can establish misappropriation by Schwab and that Duffy cannot establish a claim for misappropriation because Duffy's submission to Schwab was not novel, confidential, nor adopted and used by Schwab. (*See* Def.'s Br. in Supp. of Mot. for Summ. J. ("Def.'s Br.") at 1.) In response, Duffy argues that disputed issues of material fact preclude dismissal of the remaining counts and that its claims based on unfair competition, unjust enrichment, and breach of an implied contract are not entirely dependent on its misappropriation claim and should not be so limited. (Pls.' Mem. in Opp'n to Def.'s Mot. for Summ. J. ("Pls.' Br.") at 19–30).

### DISCUSSION

Federal Rule of Civil Procedure 56(c) provides that summary judgment is proper "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The party moving for summary judgment bears the initial burden of showing that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party has met its initial burden, the non-moving party must present evidence that establishes that a genuine issue of material fact exists, making it necessary to resolve the difference at trial. *Id.* at 324, 106 S.Ct. 2548; *Jersey Cent. Power & Light Co. v. Lacey Township*, 772 F.2d 1103, 1109 (3d Cir.1985). A non-moving party may not rely on mere allegations; it must present actual evidence that creates a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

In deciding a motion for summary judgment, the Court must view the evidence in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The role of the judge at the summary judgment stage is not to weigh the evidence, but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505. "By its very terms, the standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Id.* at 247–48, 106 S.Ct. 2505. Material facts are only those facts that might affect the outcome of the action under governing law. *Id.* at 248, 106 S.Ct. 2505; *Boyd v. Ford Motor Co.*, 948 F.2d 283, 285 (6th Cir.1991). "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505 (citation omitted).

We will now examine each count of the Complaint in sequence, beginning with Count One.

### I. Count One: Plaintiff's Misappropriation Claim

The parties agree that this case is governed by the leading case on misappropriation of ideas in New Jersey, *Flemming v. Ronson Corp.*, 107 N.J.Super. 311, 317, 258 A.2d 153, 156–57 (Law Div.1969), *aff'd*, 114 N.J.Super. 221, 275 A.2d 759 (App.Div.1971). In *Flemming*, the court stated,

Where there has been an unsolicited submission of an idea, ... the question which arises is whether, on the facts presented, the recipient is liable, if at all, by reason of a quasi-contractual obligation based on the doctrine of unjust enrichment. An idea, as distinguished

from the copyrighted contents of a book or a patented device or process, is accorded no protection in the law unless it is acquired and used in such circumstances that the law will imply a contractual or fiduciary relationship between the parties. Generally, one who receives a benefit which it is unjust for him to retain ought to make restitution or pay the value of the benefit to the party entitled thereto.

*Id.* at 315, 258 A.2d at 156 (citations omitted). Although not explicitly stated in the opinion, the court's opinion indicates that the cause of action recognized therein is not based upon contract law, but on tort law. *See* Restatement Third, Unfair Competition § 40 cmt. a (explaining differences between misappropriation claim based on contract and one based on tort). Thus, whether a party misappropriates another's confidential idea or some other type of property, the law will imply an obligation that the party pay the other restitution for its improper use of that property. *See id.* In rendering its holding, the court stated the test for determining whether the law will imply an obligation to pay for a confidentially submitted idea: When "a person communicates a novel idea to another with the intention that the latter may use the idea and compensate him for such use, the other party is liable for such use and must pay compensation if . . . . (1) the idea was novel; (2) it was made in confidence [to the defendant], and (3) it was adopted and made use of [by the defendant in connection with his own activities]." *Flemming,* 107 N.J.Super. at 317, 258 A.2d at 156–57.

For the reasons stated below, the evidence, viewed in the light most favorable to Duffy, demonstrates that there are no genuine issues of material fact and that Schwab is entitled to summary judgment as a matter of law with respect to Count One of Complaint. The Court will first address the first element of Duffy's misappropriation claim, whether Duffy's ideas for the Mutual Fund Report Card and the Mutual Fund Profile were novel.

## A. Whether Duffy's Idea Was Novel

The novelty requirement appears to be grounded on the "principle that an idea does not constitute property unless it is novel, and thus no recovery can be had for use of an 'unnovel' idea." *Garrido v. Burger King Corp.,* 558 So.2d 79, 84 (Fla. Dist.Ct.App.1990); *see also Nadel v. Play–By–Play Toys & Novelties, Inc.,* 208 F.3d 368, 378 (2d Cir.2000) (holding that "a misappropriation claim can only come from the taking of an idea that is original or novel in absolute terms, because the law of property does not protect against the misappropriation or theft of that which is free and available to all"). An unnovel idea may be regarded as useful, and worth using, but not every good idea is a legally protectable one. *Educ. Sales Programs, Inc. v. Dreyfus Corp.,* 65 Misc.2d 412, 317 N.Y.S.2d 840, 843 (1970). *Id.* "If the idea is of such a nature that it cannot be appropriated by a party, it cannot be misappropriated by another." *Id.* at 844 (citing *E.I. Du Pont De Nemours Powder Co. v. Masland,* 244 U.S. 100, 102, 37 S.Ct. 575, 61 L.Ed. 1016 (1917)). Accordingly, a party should not be forever barred from using another's worthwhile but unnovel idea merely because the party was once asked to keep it confidential. *Id.*

The test for determining whether an idea is sufficiently novel to warrant protection has not been clearly defined in New Jersey. To begin with, it is unclear whether this issue is an issue of fact, for the fact finder, a question of law, for the jury, or a mixed question of fact and law. In *Flemming,* the court rendered its opinion following a bench trial; thus, it did not need to determine whether the novelty issue is a question of fact, a question of law, or a mixed question of fact and law. *See Flemming,* 107 N.J.Super. at 313, 258 A.2d at 154. In addition, we have not found any New Jersey cases determining this issue. Therefore, we must predict how the New Jersey Supreme Court would resolve this issue. *See McKenna v. Pac.*

*Rail Serv.*, 32 F.3d 820, 825 (3d Cir.1994); *Becker v. Interstate Prop.*, 569 F.2d 1203, 1205 (3d Cir.1977).

■ After due consideration of the issue, we hold that the New Jersey Supreme Court would determine that although some of the factors relevant to a determination of novelty may be factual, the ultimate determination of whether an idea is novel is a question of law for the court. The court's role in this regard is analogous to the court's role with respect to the issue of obviousness in a patent case. *See, e.g., Ryko Mfg. Co. v. Nu–Star, Inc.*, 950 F.2d 714, 716 (Fed.Cir.1991) (holding that when facts relevant to issue of obviousness are not in dispute, determination of obviousness is question of law that can be resolved by court on summary judgment). In so holding, we are in accord with the only other court interpreting New Jersey law to address this issue. *See Bergin v. Century 21 Real Estate Corp.*, No. 98 Civ. 8075(JGK), 2000 WL 223833 at *9 (S.D.N.Y. Feb.25, 2000), *aff'd*, No. 00–7381, 2000 WL 1678777 (2d Cir. Nov.8, 2000). Our holding is also in accord with a number of other courts to rule on this issue. *See, e.g., Hudson Hotels Corp. v. Choice Hotels, Int'l*, 995 F.2d 1173, 1178 (2d Cir. 1993) (opining that novelty is a mixed question of law and fact), *abrogated on other grounds by Nadel*, 208 F.3d 368; *Official Airlines Schedule Info. Serv., Inc. v. E. Air Lines, Inc.*, 333 F.2d 672, 674 (holding as a matter of law that idea was not novel); *Wrench LLC v. Taco Bell Corp.*, 51 F.Supp.2d 840 (W.D.Mich.1999) (same); *Phillips v. Avis, Inc.*, No. 95 C 1566, 1995 WL 417587, at *2 (N.D.Ill. July 13, 1995) (holding that determination of whether a trade secret is novel or original is a mixed question of fact and law); *Weitzenkorn v. Lesser*, 40 Cal.2d 778, 256 P.2d 947, 954 (1953) (holding that determination of novelty is a question of law); *cf. Oasis Music, Inc. v. 900 U.S.A., Inc.*, 161 Misc.2d 627, 614 N.Y.S.2d 878 (1994) (holding that whether idea is sufficiently novel or original to merit protection under New York

law is question amenable to summary judgment). *But see All Pro Sports Camp, Inc. v. Walt Disney Co.*, 727 So.2d 363, 368 (Fla.Dist.Ct.App.1999) (holding that whether an idea is novel is a factual question); *G.D. Searle & Co. v. Philips–Miller & Assocs., Inc.*, 836 F.Supp. 520, 527 (N.D.Ill.1993) (same); *Murray v. Bank One, Colombus, N.A.*, 64 Ohio App.3d 784, 582 N.E.2d 1124, 1128–29 (1990) (same); *Wilson v. Barton & Ludwig, Inc.*, 163 Ga.App. 721, 296 S.E.2d 74, 78 (1982) (same). Even courts holding that the question is a factual one have not hesitated to grant summary judgment on the basis of lack of novelty when the underlying facts do not support a finding of novelty. *See, e.g., Wilson*, 296 S.E.2d at 78. Therefore, a court should not hesitate to make a determination as to an idea's novelty unless material facts underlying the issue of novelty are in dispute.

Having decided that the Court is required to determine whether an idea is novel, we must now ascertain the proper test to use in reaching this determination. The court in *Flemming* did not discuss a specific test that should be used to determine whether an idea is novel. Instead, the court cited a few examples of ideas that would not be considered novel. For instance, the court stated that an idea would not be considered novel if it was merely "a different application of a long-established principle," or if "a competitive product similar to [the plaintiff's] was [already] on the market." *Id.* at 318–19, 258 A.2d at 157; *see also In re Elsinore Shore Assocs.*, 102 B.R. 958, 970 (Bankr.N.J. 1989) (citing *Bram v. Dannon Milk Prods. Inc.*, 33 A.D.2d 1010, 307 N.Y.S.2d 571 (1st Dep't 1970) and *McGhan v. Ebersol*, 608 F.Supp. 277, 286 (S.D.N.Y.1985)).

In addition, the court inferred that even a novel idea would lose its novelty status if it was "in the domain of public knowledge" before the defendant used it. *Id.* at 319, 258 A.2d at 158; *see also Nadel* 208 F.3d at 378 (opining that "a once original or novel idea may become so widely dissemi-

nated over the course of time that it enters into the body of common knowledge.") "When this occurs, the idea ceases to be novel...." *Nadel,* 208 F.3d at 378. Thus, a once novel idea will lose its novelty status if the owner of the idea fails to take adequate steps to maintain the idea's secrecy.

▪ From these statements in *Flemming,* as well as our own prediction as to how the New Jersey Supreme Court would decide this issue, we conclude that to qualify as a novel idea worthy of protection, an idea must demonstrate innovation, originality, or invention. An idea will not satisfy this requirement if it is not significantly different from, or is an obvious adaptation or combination of, ideas in the public domain. *See generally Flemming,* 107 N.J.Super. at 319, 258 A.2d at 158; *Educ. Sales Programs,* 317 N.Y.S.2d at 844. The fact that an idea is an adaptation of an existing idea or embodies elements long in use, however, does not necessarily preclude a finding of novelty. *See Elsinore,* 102 B.R. at 971 (citing *Baut v. Pethick Const. Co.,* 262 F.Supp. 350, 361 (M.D.Pa. 1966)). For example, such an idea will satisfy this requirement if the adaptation or combination would lead to a significantly new and useful result. *See Elsinore,* 102 B.R. at 971; *Baut,* 262 F.Supp. at 357.

▪ Factors relevant to a determination of novelty might include, but are not limited to the following: (1) the idea's specificity or generality (is it a generic concept or one of specific application?), (2) the idea's commonality (how many people know of this idea?), (3) the idea's originality (how different is this idea from generally known ideas?), (4) the idea's commercial availability (how widespread is the idea's use in the industry?), (5) the idea's obviousness (was the idea an obvious adaptation or application of an idea already in the domain of public knowledge?), and (6) the idea's secrecy (did an otherwise novel idea lose its novelty status because of inadequate steps taken to maintain the idea's secrecy?). *See Nadel,* 208 F.3d at 378. In conducting its inquiry, the court should weigh these and any other factors relevant to the novelty issue.

On a motion for summary judgment, the court should view the evidence in the light most favorable to the non-moving party in determining whether the novelty element of a plaintiff's claim has been satisfied. A finding by the court on this issue is appropriate when the material facts underlying the court's determination are not in dispute, or if the evidence "is so one-sided that [the non-moving] party must prevail as a matter of law." *Anderson,* 477 U.S. at 251–52, 106 S.Ct. 2505.

Schwab argues that Duffy's Mutual Fund Profile and Mutual Fund Report Card were not novel because "[a]s of June, 1997, the idea of providing key mutual fund information in a concise format was well-known and clearly entrenched in the public domain as a result of the SEC's widely-known and much discussed mutual fund profile program announced in 1994." (Def.'s Br. at 26.) Duffy argues, however, that its products employ a creative and novel combination of features, displays and comparative analyses using about twenty-four data fields selected out of thousands that were available.[3] (*See* Pls.' Br. at 3–5.)

The material facts underlying the issue of novelty are not in dispute. Taking the evidence in the light most favorable to Duffy, Duffy's marketing ideas were not novel. We will now discuss our analysis of the relevant factors that we considered before arriving at our decision.

---

**3.** Duffy frames its misappropriation claim primarily in terms of the submission itself as opposed to the ideas contained therein. (*See, e.g.,* Compl. ¶¶ 19–22; Pls.' Br. at 1–2.) As set forth above, New Jersey law does not protect misappropriated submissions except to the extent that such submissions contain ideas worthy of protection. Therefore, the Court's analysis will be limited to an analysis of whether the ideas submitted by Duffy were novel.

### 1. Idea's Specificity or Generality

■ Duffy's idea was essentially to market a simple, easy to understand financial report that would allow unsophisticated investors to objectively and easily evaluate the performance of their mutual funds, compare such funds to others in a similar peer group, and thereafter facilitate the purchase of desirable funds. (*See, e.g.,* Duffy Decl. ¶ 3.) Although this idea is somewhat general, Duffy developed a prototype of the report. (Duffy Decl. Ex. C: sample Mutual Fund Report Card and Mutual Fund Profile products.) The form of Duffy's idea, therefore, encompassed a number of specific sub-ideas as to what type of information such a report should contain. Viewing all of the evidence in the light most favorable to Duffy, Duffy's idea was fairly specific. Therefore, this factor weighs in favor of a finding of novelty.

### 2. Idea's Commonality

Viewing all of the evidence in the light most favorable to Duffy, the need for a simple, easy to understand financial report by which unsophisticated investors could compare their existing money market funds against a benchmark was commonly known in June 1997 as a result of the SEC's widely-known and much discussed mutual fund profile program, which was announced in 1994. (Certif. of David Henry Dolkas, Esq. filed 7–6–00 ("Dolkas Certif.") Exs. 1–4.) Some of the fields depicted in Duffy's reports, such as investment objective, performance, fees, risk, and fund manager were specifically identified by the SEC as fields that should be included in such a profile. (*Id.*) These fields, as well as the asset allocation, overall summary, and user guide fields were commonly known to investment professionals in June 1997. (*See* discussion *infra* Part I.A.3.) After all, Duffy was to obtain all of its information from Morningstar, a supplier of mutual fund data and information. (Duffy Decl. ¶ 3.) Thus, this factor weighs against a finding of novelty.

### 3. Idea's Originality

Duffy has submitted evidence offered to show that its products employ a creative and novel combination of features, displays and comparative analyses using about twenty-four data fields selected out of thousands that were available. (Duffy Decl. ¶ 12 & Ex. C; Decl. of Gregory S. Gewirtz, Esq. ("Gewirtz Decl.") Ex. Q: 1–31–00 Dep. Tr. of Michelle E. David at 108 (testifying that Morningstar had thousands of data fields relating to mutual funds); *see also* Pls.' Br. at 3–5 (explaining each of the twenty-four data fields selected).) Viewing all of the evidence in the light most favorable to Duffy, none of the fields used by Duffy were original to Duffy, but instead were to be obtained from Morningstar. (Duffy Decl. ¶ 3; Supplemental Certif. of David Henry Dolkas, Esq. filed 7–6–00 ("Dolkas Certif. # 2") Ex. 1: Excerpts of Dep. Tr. of H. Duffy taken on 4–14–99 at 80–83.) The only information from Duffy's products that were not obtained from Morningstar were some bar or pie chart interpretations of data obtained from Morningstar; opinions relating to data obtained from Morningstar, such as "average," "above average," and "below average" in connection with a fund's performance, fees, risk, and asset allocation; grades given for an investor's current funds, such as "A," "B," "C," "D," and "F," based on the fund's rate of return over time; and a user guide providing the investor with instructions for reading the reports. (*See* Duffy Decl. Ex. C; Dolkas Certif. # 2 Ex. 1 at 80–83.) Although none of the fields used by Duffy were original to Duffy, the combination of fields chosen did involve some degree of originality. The degree of originality involved, however, was not high. Many, if not most, of these fields were already depicted in reports being provided by competitors in the industry or prototypes to Schwab's Mutual Fund Report Card ("Schwab prototypes"). For example, investment objective information was already being depict-

ed in Morningstar's "Ascent" mutual fund report (the "Ascent report") (Dolkas Certif. Ex. 22: sample Ascent report), America Online's mutual fund report (the "AOL report") (*id.* Ex. 10: sample AOL report), Morningstar's "Mutual Funds OnDemand" report (the "MFOD report") (*id.* Ex. 8: sample MFOD report), and Lipper's mutual fund report (the "Lipper report") (*id.* Ex. 9: sample Lipper report); performance information was already being shown in the Ascent, AOL, MFOD, and Lipper reports, and Schwab prototypes (*id.* Exs. 8, 10, 22); fee information was already being shown in the Ascent, AOL, MFOD, and Lipper reports, and the Schwab prototypes (*id.* Exs. 8–10, 22); risk information was already being shown in the Ascent, AOL, and MFOD reports (*id.* 8, 10, 22); asset allocation information was already being depicted in the Ascent, AOL, MFOD, and Lipper reports (*id.* Exs. 8–10, 22); fund manager information was already being depicted in the Ascent, AOL, MFOD, and Lipper reports (*id.* Exs. 8–10, 22); manager tenure information was already being shown in the AOL and MFOD reports (*id.* Exs. 8, 10); the Morningstar ratings summary, depicting overall rating, return, and risk, was already being depicted in the MFOD report (*id.* Ex. 8); the user guide was already being used by Schwab in connection with many of its products. (Dolkas Certif. # 2 ¶ 4, Ex. 4: Excerpts from Dep. Tr. of Carolyn Schuetz taken on 1–27–00, Ex. 5: Various User Guides offered by Schwab as of Mar. 1996 on *Research on Request,* & Ex. 6: Excerpts from Dep. Tr. of Alexandra L. Seifert taken 1–26–00.)

Duffy argues that its idea was novel because Duffy spent many months deciding the organization and layout of the data so its products could be readily understood by nonprofessional investors. (Pls.' Br. at 3.) In fact, Duffy spent three pages of his brief explaining how the categories of information are shown with respect to one another. (Pls.' Br. at 3–5.) In addition, Duffy spent numerous additional pages explaining the differences in the organization and layout between its products and prior mutual fund reports, and the similarities in the layout and organization between its products with the Schwab Mutual Fund Report Card. (Pls.' Br. at 7–11, 15–18.) During his deposition, H. Duffy stated that it was the format that made Duffy's reports unique and proprietary to Duffy. (*See* Dolkas Certif. # 2 Ex. 1: Excerpts from Dep. Tr. of H. Duffy taken on 4–14–99 at 83.) Although the organization and layout of the data may involve some originality, the originality conveyed goes more to the idea's expression than to the idea itself.[4] An idea's expression is not entitled to protection under a state's misappropriation law.[5] Therefore, even though the depiction or situation of fields with respect to one another involves some originality, it is not the type of originality protected under New Jersey's misappropriation law. Viewing all of the evidence in the light most favorable to Duffy, Duffy's idea showed little originality. Accordingly, this factor weighs against a finding of novelty.

### 4. *Idea's Commercial Availability*

Duffy argues that there are numerous differences between its Mutual Fund Profile and Mutual Fund Report Card and mutual fund reports that were commercially available in June 1997. (Pls.' Br. at 7–11.) As previously discussed herein, products incorporating ideas similar to Duffy's were already commercially available. *See* discussion *supra* Part I.A.3. For example, Morningstar, AOL, and Lipper already

---

**4.** Although organization and layout are not material to an idea's novelty, similarity in organization and layout could be used as evidence that Schwab used Duffy's idea.

**5.** To the extent a state's misappropriation law purports to impose liability for the misappro-priation of an idea's expression, such a law would be preempted by federal copyright law. *See, e.g.,* 17 U.S.C. § 106; *Wilson v. Mr. Tee's,* 855 F.Supp. 679, 684–85 (D.N.J.1994); *Rowe v. Golden W. Television Prods.,* 445 A.2d 1165, 184 N.J.Super. 264 (App.Div.1982).

had products on the market that sought to provide a condensed summary of a mutual fund's performance. Viewing all of the evidence in the light most favorable to Duffy, ideas comparable to Duffy's were already commercially available. Accordingly, this factor weighs against a finding of novelty.

### 5. Idea's Obviousness

Taking the evidence in the light most favorable to Duffy, Duffy's idea was only slightly different from pre-existing ideas in the public domain or products already on the market. (*Compare* Duffy Decl. Ex. C *with* Dolkas Certif. Exs. 8–10, 22.) The only difference between Duffy's idea and pre-existing products and ideas was that Duffy's proposed products purport to cater to a less sophisticated investor. The need for such a product, to the extent not already being provided, was widely known in the industry.[6] (*See, e.g.,* Dolkas Certif. Exs. 1–5.) The idea to adapt these products or ideas to cater to a less sophisticated investor would have been an obvious adaptation of these products and ideas. *See, e.g., Murray v. Nat'l Broad. Co.,* 671 F.Supp. 236, 241–44 (S.D.N.Y.1987) (holding as a matter of law that plaintiff's idea was not novel when it merely combined two ideas that had been circulated in the industry for a number of years). Accordingly, this factor weighs against a finding of novelty.

### 6. Idea's Secrecy

As previously set forth above, a once novel idea will lose its novelty status if the owner of the idea fails to take adequate steps to maintain the idea's secrecy. *See* discussion *supra* p. 809. As is the case with respect to trade secrets, "[p]recautions taken to maintain the secrecy of [a novel idea] are relevant in determining whether the [idea] qualifies for protection."

**6.** It is not relevant whether Duffy's proposed products were superior to pre-existing products in the market. The idea for a product may be protected to the extent it is novel, but not to the extent its realized form or expres-

*See* Restatement Third, Unfair Competition § 39 cmt. g (discussing degree of secrecy necessary before information will be considered a trade secret). "Precautions to maintain secrecy may take many forms, including physical security designed to prevent unauthorized access, procedures intended to limit disclosure based upon the "need to know," and measures that emphasize to recipients the confidential nature of the information such as nondisclosure agreements, signs, and restrictive legends." *Id.*

"[A] holder of a [novel idea] may divulge his information to a limited extent without destroying its status as a [novel idea]. To hold otherwise would greatly limit the holder's ability to profit from his [idea]. If disclosure to others is made to further the holder's economic interests, it should, in appropriate circumstances, be considered a limited disclosure that does not destroy the requisite secrecy." *Metallurgical Indus. v. Fourtek, Inc.,* 790 F.2d 1195, 1200 (5th Cir.1986) (discussing secrecy necessary to maintain protection of a trade secret). *Id.* For example, a person

> may, without losing his protection, communicate it to employees involved in its use. He may likewise communicate it to others pledged to secrecy.... Nevertheless, a substantial element of secrecy must exist, so that except by the use of improper means, there would be difficulty in acquiring the information.

*Id.* (quoting Restatement of Torts, § 757 cmt. b (1939)) (alteration in original).

Schwab argues that Duffy's ideas for the Mutual Fund Report Card and Mutual Fund Profile were not confidential when submitted to Schwab because they were not treated as confidential by Duffy prior to, and after, such submission. (Def.'s Br. at 27–28.) In support of its argument, Schwab argues that (1) Duffy's ideas were

sion is superior to others in the market. *See* discussion *supra* Part I.A.3. Therefore, if inferior versions of plaintiff's products pre-existed in the public domain, then plaintiff's ideas, even if superior, would not be novel.

publicly disclosed to several companies and individuals other than Schwab on a non-confidential basis (*id.* at 27), (2) Duffy did not enter into confidentiality agreements or request the return of its materials after Duffy's proposals were rejected (*id.* at 27–28), and (3) if Duffy had intended his proposals to be confidential, it would have entered into confidentiality agreements and requested the return of its materials following a rejection. (*Id.* at 27–28.)

Duffy has submitted evidence, however, showing that it took reasonable steps to maintain the confidentiality of its idea and that it did submit its proposal to Schwab in confidence. For example, Duffy has submitted evidence to show that it only disclosed its idea to a select few companies or individuals and that it either discussed confidentiality with the recipient before submitting the materials, or marked the submission as "proprietary and confidential." (*See* Duffy Decl. ¶ 27.) In addition, as far as Duffy is aware, none of these entities or persons ever breached the confidential relationship by disclosing the idea. (*See id.*) Duffy also submitted evidence that it researched ways to ensure confidentiality of its idea before sharing it with anyone. (*See id.* ¶¶ 5–8.) Finally, Duffy submitted evidence showing that (1) before sending its proposal to Schwab, Duffy requested that the proposal be kept confidential and that Schwab agreed to do so (*see id.* ¶¶ 9–10, 14–15), and (2) it marked its proposal as "proprietary and confidential" before submitting it to Schwab. (*Id.* ¶ 11 & Ex. C.) Viewing the evidence in the light most favorable to Duffy, Duffy took reasonable steps to maintain the confidentiality of its idea. Therefore, this factor weighs in favor of the idea's novelty.

### 7. Overall Analysis of Novelty

Taking each of the above factors into consideration, the Court concludes that Duffy's idea is not novel as a matter of law. Duffy's idea differs only slightly from pre-existing ideas in the domain of public knowledge and products that were already available on the market. The need for a simple, easy to understand report was being publicly discussed since 1994 and a number of companies already had such reports on the market. In addition, the originality expressed by Duffy in choosing the fields to be used for its products went more to the idea's expression than the idea itself. For these reasons, the Court finds as a matter of law that Duffy's idea was not sufficiently novel to warrant protection as a confidentially submitted idea. Accordingly, the Court will grant Schwab's motion for summary judgment with respect to Count One of the Complaint.

### II. Count Two: Plaintiff's Unjust Enrichment Claim

■ "Under New Jersey law, '[t]he constructive or quasi -contract is the formula by which enforcement is had of a duty to prevent unjust enrichment or unconscionable benefit or advantage.'" *Suburban Transfer Serv., Inc. v. Beech Holdings, Inc.,* 716 F.2d 220, 226 (3d Cir.1983) (quoting *Borough of West Caldwell v. Borough of Caldwell,* 26 N.J. 9, 29, 138 A.2d 402, 412 (1958)) (alteration in original). "Quasi-contractual obligations are imposed by the law for the purpose of bringing about justice." *Id.* Restitution for unjust enrichment is an equitable remedy, available only when there is no adequate remedy at law. *National Amusements, Inc. v. N.J. Tpk. Auth.,* 261 N.J.Super. 468, 478, 619 A.2d 262, 267 (Law Div.1992), *aff'd,* 275 N.J.Super. 134, 645 A.2d 1194 (App.Div. 1994). Quasi-contract liability will not be imposed when a valid, unrescinded contract governs the rights of the parties. *Van Orman v. Am. Ins. Co.,* 680 F.2d 301, 310 (3d Cir.1982); *see also Suburban Transfer,* 716 F.2d at 226. Therefore, recovery based on a quasi-contract theory is mutually exclusive of a recovery based on a contract theory. *See id.; see also Caputo v. Nice–Pak Prods., Inc.,* 300 N.J.Super. 498, 507, 693 A.2d 494, 498 (App.Div.1997).

■ "To establish unjust enrichment, a plaintiff must show both that defendant received a benefit and that retention of that benefit without payment would be unjust." *VRG Corp. v. GKN Realty Corp.,* 135 N.J. 539, 554, 641 A.2d 519, 526 (1994). "The unjust enrichment doctrine requires that plaintiff show that it expected remuneration from the defendant at the time it performed or conferred a benefit on defendant and that the failure of remuneration enriched defendant beyond its contractual rights." *Id.*

■ As set forth in Part I above in connection with Duffy's misappropriation claim, New Jersey law does not impose an obligation on a defendant to pay for use of an idea submitted to it in confidence unless the idea is novel. *See supra* Part I. We held in Part I of this opinion that Duffy's idea was not novel. Therefore, in the absence of a contractual obligation by Schwab to compensate Duffy for use of its idea, it was not unjust for Schwab to use Duffy's idea without compensating Duffy. Accordingly, the Court will grant Schwab's motion for summary judgment as to Count Two of the Complaint.

### III. Count Three: Plaintiff's Unfair Competition Claims

■ Duffy asserts unfair competition claims under New Jersey common law and N.J.S.A. § 56:4–1.[7] As we explained in our prior opinion, New Jersey's "law of unfair competition is an amorphous area of jurisprudence. It knows of no clear

boundaries.... The concept is as flexible and elastic as the evolving standards of commercial morality demand." *N.J. Optometric Ass'n v. Hillman–Kohan Eyeglasses, Inc.,* 144 N.J.Super. 411, 427, 365 A.2d 956 (Ch.Div.1976). "[T]he tendency of the law [in this area] 'has been in the direction of enforcing increasingly higher standards of fairness or commercial morality in trade.'" *Q–Tips, Inc. v. Johnson & Johnson,* 206 F.2d 144, 145 (3d Cir.1953) (quoting Restatement, Torts, Vol. III, p. 540) (quoted in *Squeezit Corp. v. Plastic Dispensers,* 31 N.J.Super. 217, 221, 106 A.2d 322 (App.Div.1954)).

Although it is impossible to categorize all acts which constitute unfair competition, there are a few fundamental elements that are definite. In essence, unfair competition is a business tort. Generally it consists of the misappropriation of one's property by another—or property which has some sort of commercial or pecuniary value. The misappropriation usually takes the form of 'palming off' another's goods as your own, although the modus operandi is not essential.

*Hillman–Kohan,* 144 N.J.Super. at 427–28, 365 A.2d 956 (citations omitted). Some acts that constitute unfair competition have been described as follows:

either that the means used are dishonest, or that, by imitation of name or device, there is a tendency to create a confusion in the trade, and enable the seller to pass off upon the unwary his goods as those of another, and thereby

---

7. N.J.S.A. § 56:4–1 states: "No merchant, firm or corporation shall appropriate for his or their own use a name, brand, trade-mark, reputation or goodwill of any maker in whose product such merchant, firm or corporation deals." The parties have not attempted to distinguish between the elements comprising Duffy's unfair competition claim under New Jersey common law and Duffy's claim based upon N.J.S.A. § 56:4–1. (Pl.'s Br. at 6–8; Def.'s Br. at 22–23.) At least one court has stated that N.J.S.A. § 56:4–1 codified the common law authority of unfair competition. *Nat'l Football League Props., Inc. v. N.J. Giants, Inc.,* 637 F.Supp. 507, 519 (D.N.J.1986).

*But cf. Columbia Broad. Sys., Inc. v. Melody Recordings, Inc.,* 134 N.J.Super. 368, 375, 341 A.2d 348 (App.Div.1975) (stating that prior version of N.J.S.A. § 56:4–1 "does [not] attempt to regulate different unfair practices which have historically been reached by common law precepts" in holding that N.J.S.A. § 56:4–1 "does not, by negative implication, immunize from judicial concern business or commercial conduct, which is injurious and otherwise unfair, improper or wrongful.") Without deciding that the elements of these claims are identical, the Court will treat them as such in deciding this motion.

deceive the purchaser; or that, by false representation, it is intended to mislead the public, and induce them to accept a spurious article in the place of one they have been accustomed to use.

*Squeezit,* 31 N.J.Super. at 221–22, 106 A.2d 322 (quoting *Vitascope Co. v. U.S. Phonograph Co.,* 83 F. 30, 32 (C.C.D.N.J. 1897)).

> In the absence of a patent [or copyright], there is nothing to prevent the imitation or reproduction of a product provided the imitator does not misrepresent to the public that his product is made by others or cause confusion as to whose product it is or that the product has not yet acquired secondary meaning or an identification coming from appearance. *Of course, where the imitation is obtained by fraud or breach of confidential relation, the copying will be enjoined.*

*Id.* at 222, 106 A.2d 322 (internal citations omitted) (emphasis added) (citing with approval *Booth v. Stutz Motor Car Co. of America,* 56 F.2d 962 (7th Cir.1932) (holding that designer whose plans were communicated confidentially to automobile manufacturer was entitled to accounting of damages and profits to extent that novel features of such plans contributed to car's success)); *see also Hoffman–La Roche Inc. v. Genpharm Inc.,* 50 F.Supp.2d 367, 380–81 (D.N.J.1999) (holding that misappropriation of a trade secret constitutes unfair competition under New Jersey law).

 The only theory upon which Duffy alleges a violation of New Jersey's unfair competition law is premised on Schwab's alleged imitation of Duffy's products through breach of a confidential relation. This theory is identical to the claim raised in Count One of the Complaint, which is premised on misappropriation of a confidential idea. In Part I of this opinion, we held that Duffy's idea was not entitled to any protection because it was not novel. *See supra* Part I. We also said that the novelty requirement was grounded on the principle that an idea does not constitute property unless it is novel. *See supra* Part I.A. A prerequisite to an act of unfair competition is that one party misappropriates another's property. *See id.; see also Hillman–Kohan,* 144 N.J.Super. at 427–28, 365 A.2d 956. Duffy's unfair competition claim must fail because it has no property interest in the idea that was allegedly misappropriated. Accordingly, we hold that the evidence, viewed in the light most favorable to Duffy, demonstrates that there are no genuine issues of material fact and that Schwab is entitled to summary judgment with respect to Count Three of the Complaint.

### IV. Count Four: Plaintiff's Breach of Implied Contract Claim

Duffy does not allege in Count Four of the Complaint the theory under which the Court should imply a contract, in other words, whether it is based upon breach of a contract implied in fact or one implied in law. A "contract implied in law" is a somewhat disfavored synonym for a "quasi-contract" because a quasi-contract is not a contract at all. *Wanaque Borough Sewerage Auth. v. Township of W. Milford,* 144 N.J. 564, 574, 677 A.2d 747, 752 (1996). To the extent that Count Four is based upon breach of a contract implied in law, the analysis to be employed by the Court would be the same as that we employed with respect to Count Two, based on unjust enrichment. *See, e.g., St. Paul Fire & Marine Ins. Co. v. Indem. Ins. Co. of N. Am.,* 32 N.J. 17, 22, 158 A.2d 825, 827–28 (1960) (opining that quasi-contractual obligation (implied in law) is imposed by law for purpose of preventing unjust enrichment at expense of another without reference to intention of parties); *see also supra* Part II. Therefore, we will not address that theory again here.

 Unlike a contract that is implied in law, a contract that is implied in fact has the same legal effect as an express contract. *See St. Paul Fire,* 32 N.J. at 23, 158 A.2d at 828. The only difference between an implied-in-fact contract and an

express contract is that the parties' agreement has been manifested by conduct instead of words. *Id.; Saint Barnabas Med. Ctr. v. County of Essex,* 111 N.J. 67, 77, 543 A.2d 34, 39 (1988). "Like express contracts, contracts implied in fact depend on 'mutual agreement and intent to promise ... and can be established by objective proofs.'" *Saint Barnabas,* 111 N.J. at 77, 543 A.2d at 39 (quoting *Borough of W. Caldwell v. Borough of Caldwell,* 26 N.J. 9, 29, 138 A.2d 402 (1958)). The relevant inquiry when proof of agreement is sought to be established through conduct rather than words is whether the conduct of the defendant, as viewed by a reasonable person in the relevant custom or trade, revealed a promise to pay. *Saint Barnabas,* 111 N.J. at 77, 543 A.2d at 39; *St. Paul Fire,* 32 N.J. at 24, 158 A.2d at 828. Applying this standard to the facts of this case, if a reasonable person in Schwab's industry would view Duffy's confidential submission to Schwab as an offer to let Schwab use the ideas contained therein in exchange for reasonable compensation, then a contract could be inferred if Schwab used the ideas contained in Duffy's submission.[8] Whether Duffy's idea was used by Schwab is a question of fact. Absent direct evidence of such use, plaintiff must attempt to prove this element from circumstantial evidence.

In *Flemming,* the court stated,

Where the issue is whether one's idea has in fact been used by another, similarities between the submission and the

ultimate product may justify the factual inference that one was copied from the other. If the concept submitted is unique, or if there are many points of likeness, the inference is strengthened. On the other hand, a lack of novelty or the existence of many dissimilar features will support a denial that the idea was used by the recipient.

*Id.* at 317–18, 258 A.2d at 157.

For Duffy to prevail, it must appear that the idea utilized by Schwab came from the plaintiff. *Id.* at 319, 258 A.2d at 158. A mere showing of similarities will not fulfill this requirement because Schwab may have obtained the information from sources independent of the plaintiff. For example, if Schwab had preexisting knowledge of Duffy's idea or had independently developed the idea for the Schwab Mutual Fund Report Card, then no consideration would exist for a contract with Duffy because Schwab would have obtained the idea from other sources, and the law will not infer an obligation to pay for that which one already possesses. *See, e.g., Nadel,* 208 F.3d at 375.

On the other hand, if Schwab was not aware of the idea, then the idea might have substantial value to Schwab even though it might not be novel in a general sense. *Id.* at 377. For example, Schwab might benefit "by not having to expend resources pursuing the idea through other channels or by having a profit-making idea implemented sooner rather than later."

**8.** In *Flemming,* the court did not define the type of conduct that would constitute a "use" sufficient to impose liability under New Jersey's misappropriation law. Absent such direction, we predict that the New Jersey Supreme Court would look to other sources for guidance. Such guidance is provided by analogy in the *Restatement of the Law of Unfair Competition. See Restatement Third, Unfair Competition* § 40 cmt. c (explaining types of acts constituting "use" of a trade secret). As with trade secrets, we believe there are no technical limitations on the nature of the conduct sufficient to constitute "use" of a novel idea. *See id.* "As a general idea, any exploitation of [a novel idea] that is likely to result

in injury to the ... owner or enrichment to the defendant is a 'use'...." *Id.* Thus, marketing goods that embody the novel idea, employing the novel idea in manufacturing or production, relying on the novel idea to assist or accelerate research or development, or soliciting customers through the use of information that is a novel idea all constitute "use" sufficient to impose liability. *See id.* "However, if the contribution made by the [novel idea] is so slight that the actor's product or process can be said to derive from other sources of information or from independent creation, the [novel idea] has not been 'used' for purposes of imposing liability...." *Id.*

818

*Id.* (quoting *Apfel,* 81 N.Y.2d 470, 600 N.Y.S.2d 433, 616 N.E.2d 1095).

■ Recognizing the difficulty of proving consideration in a submission-of-idea case when no subsequent promise to pay for the idea was made, some courts have required a plaintiff to prove, in such situations, that the idea submitted was novel to the defendant. *See, e.g., Nadel,* 208 F.3d 368; *Apfel,* 81 N.Y.2d 470, 600 N.Y.S.2d 433, 616 N.E.2d 1095. These courts have not required a plaintiff to prove that the idea was novel in absolute terms, as when the claim is based upon misappropriation of a confidential submission; instead, these courts have held that a showing of novelty to the buyer will supply sufficient consideration to support an implied-in-fact contract. *Nadel,* 208 F.3d at 376. We believe that New Jersey's highest court would follow the approach taken by the Second Circuit in *Nadel v. Play–By–Play Toys & Novelties, Inc.,* 208 F.3d 368, 378 (2d Cir. 2000). In *Nadel,* the Second Circuit held that a plaintiff in a submission-of-idea case based on an implied-in-fact contract for use of a confidential idea must show that the disclosed idea was novel to the defendant when submitted in order to find adequate consideration for the formation of a legally enforceable contract. *Id.* at 380. The novelty-to-defendant requirement provides the evidentiary basis for a fact finder to infer that (1) the idea was sufficiently valuable to defendant that he might agree to compensate plaintiff for its use and (2) defendant in fact used the idea.[9] This requirement, therefore, is a substitute for consideration.

Following the principles laid out above, we hold that New Jersey law in submission-of-idea cases based on an implied-in-fact contract is governed by the following principles: A plaintiff must show that the disclosed idea was novel to the defendant in order to find consideration for the alleged contract. *Id.* at 380. Whether or not an idea was novel to a particular defendant when an idea was submitted to it involves a fact-specific inquiry that focuses on the perspective of the defendant. *Id.* Finally, an idea may be so lacking in novelty that, as a matter of law, the buyer is deemed to have knowledge of the idea. *Id.* In such cases an implied-in-fact contract claim for uncompensated use of an idea may not lie. *See id.*

■ "Of course, the mere disclosure of an unnovel idea to a defendant, to whom the idea is novel, will not automatically entitle a plaintiff to compensation upon the defendant's subsequent use of the idea." *Id.* at 377 n. 5. An implied-in-fact contract requires every element of a contract to be proved: mutual assent, consideration, legality of object, and capacity of the parties. *See id.; Cohn v. Fisher,* 118 N.J.Super. 286, 291, 287 A.2d 222, 224 (Law Div.1972). "The existence of novelty to the buyer only addresses the element of consideration necessary for the formation of a contract. Thus, apart from consideration, the formation of a contract will depend upon the presence of the other elements. The element of mutual assent, for example, must be inferred from the facts and circumstances of each case, including such factors as the specific conduct of the parties, industry custom, and course of dealing." *Nadel,* 208 F.3d at 377 n. 5; *see also St. Paul Fire,* 32 N.J. at 25–26, 158 A.2d at 829–30. One aspect of the mutual assent element in an implied-in-fact breach of contract claim involving use of a confidential submission is that the defendant used the idea.[10] Defendant's use of the idea is

**9.** *See Joseph Lande & Son v. Wellsco Realty,* 131 N.J.L. 191, 34 A.2d 418 (E & A.1943) ("Whatever consideration a promissor assents to as the price of his promise is legally sufficient 'consideration.' "); *cf. Flemming,* 107 N.J.Super. at 317–18, 258 A.2d at 157 (stating in connection with misappropriation of confidential submission claim that novelty element was more important for its evidentiary value in establishing defendant's use of plaintiff's idea than for its substantive quality).

**10.** Even when a breach of contract claim for use of a confidential submission is based on an express contract, liability might not lie. In order to recover for a breach of contract, a

the basis for inferring that defendant agreed to compensate the plaintiff for its idea. Unless a plaintiff proves that defendant used the idea, a plaintiff will not be able to prove that a defendant agreed to pay for the idea.

 Schwab essentially argues that Duffy's implied-in-fact contract claim must fail because Duffy's idea was not novel to it, and it did not use Duffy's idea in developing the Schwab Mutual Fund Report Card before Duffy submitted its ideas to Schwab. (Def.'s Reply Br. at 13–14.) Schwab submits evidence of its prior knowledge of the idea and its independent development of the idea before Duffy's June 1997 submission. (*See, e.g.,* Dolkas Certif. Exs. 8–24; Dolkas Certif. # 2 Exs. 4–6; Decl. of Gibson Scheid filed 7–6–00 ¶¶ 3–10; Decl. of Jerry Ball filed 7–6–00 ¶¶ 3–16.) Schwab submitted very little evidence of its independent development after Duffy's June 1997 submission. (*See, e.g.,* Dolkas Certif. Ex. 26; Dolkas Certif. # 2 Ex. 3.) Without this information, the Court is left with no way of knowing whether the development of Schwab's report was influenced by Duffy's submission. Evidence relating to Schwab's independent development of the Schwab Mutual Fund Report Card after Duffy's submission is highly relevant in determining (1) whether Duffy's ideas were novel to Schwab, allowing a fact finder to infer adequate consideration, and (2) whether Schwab used Duffy's idea to improve its product, allowing a fact finder to infer intent. Accordingly, we will deny Schwab's motion for summary judgment as to Count Four of the Complaint without prejudice to Schwab's filing of a properly substantiated motion.

### CONCLUSION

For the reasons expressed above, the Court finds that Duffy has failed to pro-

---

plaintiff must demonstrate some nexus or causal connection between plaintiff's disclosure and the defendant's use of the idea. *Nadel,* 208 F.3d at 380 n. 10. For example, when there is an independent source for the

vide evidence of a genuine issue of material fact with respect to Counts One, Two, and Three of the Complaint. The Court holds therefore that Schwab is entitled to summary judgment dismissing Counts One, Two, Three of the Complaint. The Court finds, however, that a genuine issue of material fact is in dispute as to Count Four of the Complaint. The Court holds therefore that Schwab is not entitled to summary judgment as to Count Four of the Complaint.

---

idea used by the defendant, which defendant obtained subsequent to defendant's receipt of the idea from the plaintiff, no claim for recovery may lie because the idea used was not necessarily derived from the plaintiff. *See id.*